Jerome H. LEMELSON, Plaintiff,

v.

The UNITED STATES, Defendant,

Cincinnati Milacron, Inc., and Champion Spark Plug Co., Third-Party Defendants.

No. 175–81C.

United States Claims Court.

Feb. 29, 1988.

Ronald R. Snider, Washington, D.C., for plaintiff.

Michael J. Fink, Washington, D.C., with whom was Acting Asst. Atty. Gen. James M. Spears, for defendant.

Robert L. Harmon, Cincinnati, Ohio, for third-party defendant Cincinnati Milacron, Inc., Gary M. Ropski of counsel.

Mark C. Schaffer, Toledo, Ohio, for third-party defendant Champion Spark Plug Co.

## OPINION

ANDEWELT, Judge.

In this patent action filed pursuant to 28 U.S.C. § 1498, plaintiff, Jerome H. Lemelson, seeks compensation from the United States for the alleged unauthorized use of the inventions covered by three United States patents owned by plaintiff, Reissue Patent No. 26,904 (the '904 patent), Patent No. 3,412,431 (the '431 patent), and Patent No. 3,259,958 (the '958 patent).[1] The devices used by the United States that are alleged to be covered by plaintiff's patents are industrial robots purchased from third-party defendants Cincinnati Milacron, Inc. (Milacron) and Champion Spark Plug Co. (Champion). Plaintiff contends that use of the Milacron robots infringes all three patents at issue, and that use of the Champion robots infringes the '431 patent.[2]

---

1. As originally filed, the complaint alleged unauthorized use of seven of plaintiff's patents. Pursuant to plaintiff's motion for partial dismissal and a stipulation of the parties, the action was dismissed with respect to U.S. Reissue Patent No. 27,129, U.S. Patent No. 3,372,568; U.S. Patent No. 3,559,256, and U.S. Patent No. 3,559,257.

2. Technically, the Government does not "infringe" a patent. Patent infringement, *per se*, is defined in 35 U.S.C. § 271. Patent suits against the United States are not brought under Title 35 but, rather, are brought under 28 U.S.C. § 1498. Section 1498 does not use the term "infringement," but permits a patent owner to recover just compensation for unauthorized use by the United States of inventions "covered by a patent." While the statutory terms differ, the analysis employed under § 1498 to determine unauthorized use is identical to the two-step analysis employed to determine infringement under § 271, which is described herein at pp.

The case is presently before the Court on a motion to dismiss filed by Milacron, and on motions for summary judgment filed by Milacron and Champion which are joined in by defendant United States.[3] Milacron's motion for summary judgment covers the '904 patent and the '431 patent. Champion's motion for summary judgment covers the '431 patent.[4] For the reasons set forth herein, all of the motions are denied with the exception of Milacron's motion for summary judgment with respect to the '431 patent, which will be resolved in a separate order.

## I. *Milacron's Motion to Dismiss*

Milacron moves to dismiss this action pursuant to RUSCC 41(b) as a sanction for plaintiff's asserted failure to comply with the rules of this Court. As grounds for its motion, Milacron first contends that the complaint does not satisfy Court of Claims Rule 35(e), now RUSCC 9(h)(4). Second, Milacron contends that Lemelson instituted the suit based on a "guess" and lacked requisite knowledge that the United States infringed each of the patents listed in the complaint.

### A. The Alleged Violation of RUSCC 9(h)(4)

■ Milacron is correct that Lemelson's complaint does not satisfy the requirements of Rule 9(h)(4). That rule provides that "[t]he complaint shall include ... the claim or claims of the patent or patents alleged to be infringed." But the only reference to patent claims in Lemelson's complaint is in paragraph 6, which states that the accused devices infringe "one or more claims of each of" the cited patents. The complaint does not specify which particular claims of the cited patents were infringed.

Lemelson argues that his complaint complies with Rule 9(h)(4) because it alleges "unauthorized use ... of the inventions covered by" the patents. This broad allegation, Lemelson argues, put Milacron on notice that all claims of each listed patent were allegedly infringed. But if Lemelson meant to allege that all claims of the patents originally in issue were infringed, he should have specifically said so. Instead, he used the term "one or more claims," which leaves indefinite precisely the information that the rule requires to be stated with definiteness.

■ The issue therefore becomes whether Lemelson's failure to comply with Rule 9(h)(4) warrants dismissal of this action. While Rule 9(h)(4) is an important rule aimed at simplifying complex patent litigation, on the facts of this case, its violation does not warrant dismissal. Involuntary dismissal is "the most severe in the spectrum of sanctions provided by statute or rule." *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976). In a patent infringement action, dismissal has the extreme effect of depriving the patent owner of its right to enforce its patent property—property that typically is created as a result of a substantial investment by the patent owner in inherently risky research and development activities.

Involuntary dismissal is certainly appropriate where a plaintiff "repeatedly and without valid justification ignore[s] both court-imposed deadlines and court rules." *Kadin Corp. v. United States,* 782 F.2d 175, 176 (Fed.Cir.1986), *cert. denied,* 476 U.S. 711, 106 S.Ct. 2895, 90 L.Ed.2d 982

---

6–8. See, *e.g., Teledyne McCormick Selph v. United States,* 214 Ct.Cl. 672, 682–685, 558 F.2d 1000, 1005–1007 (1977).

3. The record does not reflect the Government's views on Milacron's motion to dismiss.

4. Milacron and Champion filed their motions for summary judgment on November 15, 1982, and January 19, 1983, respectively. Milacron's motion, as originally filed, also sought summary judgment with respect to the '958 patent, but

Milacron subsequently withdrew that part of its motion. On February 3, 1983, plaintiff moved to stay discovery and other pretrial proceedings pending resolution of the pending motions. The judge to whom the case was originally assigned heard oral argument on the motions for summary judgment twice. The first argument was heard on September 21, 1983, but was not transcribed. The second oral argument was heard on January 15, 1987. The case was reassigned to this Judge on August 3, 1987.

(1986). But here, there is no allegation that Lemelson's violation of pleading Rule 9(h)(4) was a product of bad faith, or that he engaged in the type of dilatory and obstructionist conduct typically found to warrant involuntary dismissal. See, *e.g.*, *Kadin Corp.*, 782 F.2d at 176; *Anchor Estates, Inc. v. United States*, 11 Cl.Ct. 578, 587–588 (1987).

### B. Lemelson's Alleged Lack of Knowledge of Infringement

Milacron next asserts that the complaint should be dismissed because Lemelson had no basis for instituting this action at the time the complaint was filed and, further, continues to lack any basis for pursuing his claims. In support, Milacron relies upon certain passages from discovery responses obtained from Lemelson. For instance, when Lemelson was asked at his deposition whether, prior to the time he filed this suit, it was his opinion that the patents in suit were infringed, he answered:

> I didn't really know regarding some of the patents and I just—the patents were included because I wanted to find out from the Government if indeed they were all infringed, but I didn't really know. I just took a guess that there may have been some relationship between all of these patents and what the Government was actually doing.

■ This aspect of Milacron's motion fails for several reasons. First, Milacron places undue emphasis on Lemelson's personal knowledge of and inquiries into infringement by the United States of his patents. Although not cited by Milacron, RUSCC 11 is controlling. That rule, in pertinent part, provides that for every pleading, motion, or other paper filed with the Court—

> [t]he signature of an attorney or [absent an attorney, a] party constitutes a certificate ... that to the best of his knowledge, information, and belief formed after reasonable inquiry [the paper] is well grounded in fact....

Rule 11 thus imposes upon any individual who signs a paper submitted to the Court a duty to conduct a reasonable inquiry into the accuracy of the statements made in the paper. Here, the complaint was signed by Lemelson's counsel, not Lemelson. The proper focus under Rule 11, therefore, should be on Lemelson's counsel's knowledge and level of inquiry, not Lemelson's. *DYN Logistics Services, Inc. v. United States*, 6 Cl.Ct. 353, 362–363 n. 12 (1984). See also *Thornton–Trump v. United States*, 12 Cl.Ct. 127, 130–131 (1987). But Milacron's motion does not discuss Lemelson's counsel's knowledge of or inquiry into possible infringement of plaintiff's patents.

■ Second, even if we assume that Lemelson's counsel had the same knowledge and made the same inquiries as Lemelson, Milacron still fails to establish the lack of foundation required to support a Rule 11 violation. Rule 11 does not require certainty that a plaintiff will prevail on a claim before a complaint can properly be filed. To be sure, Lemelson testified that he "guessed" that the Government was infringing some of his patents. But a "guess" can be anything from a wild stab to an educated and fairly certain prognostication, depending upon how much information the "guess" is based. Here, Lemelson has established that, prior to filing this action, he reviewed, *inter alia*, Milacron trade literature, Milacron patents, and correspondence with Milacron's patent department. He also witnessed a demonstration of the Milacron robot at a machine trade show. It simply is not possible, based on the limited and arguably conflicting evidence currently before the Court, to conclude that the general standards articulated in Rule 11 have not been met with respect to any one of the patents listed in the complaint.

In any event, Rule 11 provides that if a filing is made in violation of the rule, the court shall impose an appropriate sanction, including reasonable expenses and attorney's fees incurred by the opposing party as a result of the violation. Even if Milacron had demonstrated that Lemelson violated Rule 11, which it has not, it has failed to demonstrate that resort to involuntary

dismissal, the most severe sanction available, would be appropriate.

## II. *The Motions for Summary Judgment*

### A. The Standards for Evaluating Defendants' Motions for Summary Judgment

Summary judgment under RUSCC 56 is appropriately granted only where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. The moving party bears the burden of demonstrating the absence of any genuine issue of material fact and all significant doubt over factual issues are to be resolved in favor of the party opposing summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987); *SRI International v. Matsushita Electric Corp.*, 775 F.2d 1107, 1116 (Fed.Cir.1985).

■ Summary judgment is as appropriate in a patent infringement case as in any other case where the requisite showing is made under Rule 56. *Howes v. Medical Components, Inc.*, 814 F.2d 638, 643 (Fed. Cir.1987); *Moeller v. Ionetics, Inc.*, 794 F.2d 653, 656 (Fed.Cir.1986); *SRI International*, 775 F.2d at 1116. The patent infringement analysis involves a two-step process. First, the scope of the relevant claims is ascertained, and, second, a determination is made as to whether the claims as so interpreted cover the accused device. *Palumbo v. Don–Joy Co.*, 762 F.2d 969, 974 (Fed.Cir.1985). See also, *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 759 (Fed.Cir.1984). The two steps are distinct. "It is only after the claims have been construed without reference to the accused device that the claims, as so construed, are applied to the accused device to determine infringement." *SRI International*, 775 F.2d at 1118 (emphasis omitted) (citing *Palumbo*, 762 F.2d at 974).

■ As to the first step, ascertaining the scope of the claim, the inventor has a "verbal license;" he is his own lexicographer and is free to define his claim terms in any way he chooses. *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569 (Fed. Cir.1983) (quoting *Autogiro Co. of America v. United States*, 181 Ct.Cl. 55, 62, 384 F.2d 391, 397 (1967)); *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1558 (Fed.Cir.1983), *cert. denied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). The fundamental issue when determining the scope of a claim, therefore, is how the inventor defined the terms in the claim. This issue is resolved from the perspective of one skilled in the relevant technological area. "Claims are normally construed as they would be by those of ordinary skill in the art." *Fromson*, 720 F.2d at 1569. See also *Palumbo*, 762 F.2d at 974. Where a claim is expressed in "means plus function" language, as is permitted under 35 U.S.C. § 112, the claim is construed to cover the corresponding structures described in the specification and equivalents thereof which perform the same function. See *Spindelfabrik Suessen–Schurr v. Schubert & Salzer*, 829 F.2d 1075, 1085 (Fed.Cir.1987); *Data Line Corp. v. Micro Technologies, Inc.*, 813 F.2d 1196, 1201 (Fed.Cir.1987).

In resolving a dispute as to the scope of a claim, the Court is obligated to consider the patent specification, the other claims in the patent, and the patent's prosecution history.[5] *Howes*, 814 F.2d at 643; *Moeller*, 794 F.2d at 656. The Court also may consider other forms of extrinsic evidence, such as expert testimony, *Howes*, 814 F.2d at 643; *Moeller*, 794 F.2d at 656, or texts, such as dictionaries, explaining usage of the disputed claim terms. See, *e.g.*, *Fromson*, 720 F.2d at 1569.

■ The first step in the infringement analysis, defining the scope of the claim, involves a question of law. *Moeller*, 794 F.2d at 656; *McGill Inc. v. John Zink Co.*, 736 F.2d 666, 671 (Fed.Cir.1984), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 514, 83

---

**5.** The prosecution history of the patent claims at issue in the pending motions has not been submitted to the Court or relied upon by any of the parties. Compare *Lemelson v. United States*, 752 F.2d 1538, 1550 (Fed.Cir.1985), and cases cited therein.

L.Ed.2d 404 (1984); *SSIH Equipment S.A. v. U.S. International Trade Comm'n,* 718 F.2d 365, 376 (Fed.Cir.1983). But when a dispute arises as to the meaning of a particular term in the claim or in the specification, a question of fact exists. As the Court of Appeals for the Federal Circuit recently stated, "If the meaning of the terms in the claim, the specification, other claims or the prosecution history is disputed, that dispute must be resolved as a question of fact before interpretation can begin." *Perini America, Inc. v. Paper Converting Machine Co.,* 832 F.2d 581, 584 (Fed.Cir.1987).

In determining the meaning of a claim term, underlying fact questions may also arise, such as a dispute as to what actually occurred during the prosecution history or a conflict in expert testimony as to the general meaning of a term in the relevant trade. *H.H. Robertson Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 389 (Fed.Cir.1987); *Howes,* 814 F.2d at 643; *Moeller,* 794 F.2d at 656. See *Palumbo,* 762 F.2d at 974. Whether the accused device is a Section 112 equivalent of the structure described in the specification is a question of fact. *Palumbo,* 762 F.2d at 975.

In the second step of the infringement analysis, the structure and operation of the accused device are analyzed to determine whether the properly interpreted patent claim encompasses that device. *Mannesmann Demag Corp. v. Engineered Metal Products Co., Inc.,* 793 F.2d 1279, 1282 (Fed.Cir.1986). That application of the claim to the accused device involves issues of fact. *Id.; Fromson,* 720 F.2d at 1569. Infringement typically results if the device embodies every element in the claim. *Mannesmann,* 793 F.2d at 1282; *Builders Concrete v. Bremerton Concrete Products Co.,* 757 F.2d 255 (Fed.Cir.1985).[6] Where the accused device does not contain every element in the claim, and the claim, therefore, does not literally "read on" the accused device, infringement can nevertheless result under the "doctrine of equivalents" if the device "performs substantially the same function in substantially the same way to obtain the same result" as the claimed invention. *Graver Tank,* 339 U.S. at 608, 70 S.Ct. at 856. See also *Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 934 (Fed.Cir.1987).

The task before this Court is to evaluate the motions for summary judgment under these controlling standards.

**B. Milacron's Motion for Summary Judgment on the '904 Patent**

**1. *The Patented Invention***

The '904 patent is entitled "Article Manipulation Apparatus," and, according to the patent's abstract, involves "[a] manipulating device for performing a plurality of manufacturing functions automatically controlled by a programming means." More simply, the patent describes a robot with a movable arm and hand-like "gripper" that grasps and releases articles. The robot can be programmed to perform a variety of tasks, such as positioning and moving tools relative to a work piece.

Plaintiff alleges that the Milacron robots infringe claim 12 of the '904 patent. Claim 12 is an independent claim that covers a combination of 10 elements, labeled (a)-(j).[7]

(a) a manipulator arm assembly including first and second arm means,

(b) a base member operatively connected to said manipulator arm assembly for supporting said assembly,

(c) said first arm means being rotationally supported on said base member and said second arm means being rotationally supported on said first arm means,

(d) first servo means for rotating said arm means on said base member,

(e) second servo means for driving said second arm assembly on said first arm assembly,

(f) an article seizing head supported at the end of said second arm means,

---

**6.** Even where the claim literally reads on the accused device, however, infringement is avoided under the "reverse doctrine of equivalents" if the alleged infringer can show that the accused device "is so far changed in principle from a patented article that it performs the same or a similar function in a substantially different way...." *Graver Tank & Mfg. Co., Inc. v. Linde Air Products, Co.,* 339 U.S. 605, 608–609, 70 S.Ct. 854, 856–857, 94 L.Ed. 1097 (1950). See also *SRI International,* 775 F.2d at 1123.

**7.** Claim 12 provides:
An article manipulator for handling work in process comprising in combination:

The claim describes a robot with a two-piece arm ("a manipulator arm assembly including first and second arm means") connected to a base. A gripper ("article seizing means") is attached to the arm. The claim calls for three devices called "servo means" that cause the arm and the gripper to move. The three "servo means," respectively, rotate the arm on the base ("first servo means"), drive the second arm piece ("second servo means"), and operate the opening and closing of the gripper ("third servo means"). Each of the "servo means" has a "control." A "variable programming means," such as a computer, in turn controls each of the individual servo means to produce coordinated movement of the arm and gripper.

### 2. *The Accused Devices*

Milacron robot models T3 and HT3, which plaintiff contends infringe his patents, are one-armed, automated industrial robots designed to perform a variety of industrial tasks, such as stacking, packing, welding, painting, and drilling. The devices consist of an articulated arm, a hydraulic power supply, an electrical power unit, and a computer control. The Milacron robot arm has six axes of motion, including a roll capacity that approximates wrist action. The general arm construction of the accused devices is shown in the diagram below.

The robot arms have a reach of over 10 feet and can be affixed with a variety of tools (not shown above), such as grippers, spray heads, welding heads, and power drills.

It is unclear from the record precisely how the opening and closing of the grippers on the Milacron robots is controlled. In the affidavit submitted by Milacron with its opening motion, Richard E. Hohn, a Milacron scientist, states that the grippers are controlled through a combination of a motor and switches, with the switches serving to indicate whether the grippers are open, closed, or partially open due to the presence of a work object in the gripper. Subsequently, in connection with its reply brief, Milacron submitted a second affidavit from Hohn which indicates, in contradiction to the first affidavit, that the Milacron robots do not contain switches after all. The second affidavit states that the grippers "are not operated by any feedback from the grippers to control their position." The second affidavit does not explain how,

(g) third servo means for operating said article seizing means for grasping and releasing an article disposed adjacent thereto,

(h) controls for said servos,

(i) a variable programming means operatively connected to said servo controls and including means for generating a plurality of control signals of predetermined characteristics and in a predetermined sequence,

(j) said programming means being operative to control said manipulator in an article transfer cycle by first activating the control for said servo means to operate said seizing head to seize an article, thereafter control one of said first and second controls to effectuate the movement of the seizing head and article along a first path, thereafter control the other of said first and second servo controls to effectuate the movement of the seizing head and article along a second path, thereafter control said third servo means to effectuate the release of the article, and thereafter control said first and second control means to return the seizing head to that position at which it was located prior to initiating the described cycle so as to preposition that seizing head just prior to initiating another similar transfer cycle.

if at all, the grippers are controlled without switches or feedback.

### 3. *The Claim Elements at Issue*

Milacron seeks summary judgment with respect to the '904 patent on the grounds that the Milacron robots used by the United States do not contain at least three of the ten elements covered by claim 12 of the patent. The elements that Milacron contends are absent are: element (g), which describes the "servo means" for operating the gripper; element (i), which describes a "variable programming means" for generating signals to the servo controls "in a predetermined sequence;" and element (j), which describes how the variable programming means controls an article transfer cycle (involving movement of a seized article by the gripper and the arm from one point to another).

#### (1) Element (g)

Element (g) calls for a "third servo means for operating said article seizing means for grasping and releasing an article disposed adjacent thereto." In simpler terms, element (g) calls for a "servo means" that operates the robot gripper.

Milacron contends that summary judgment is appropriate because, according to Milacron, to constitute a "servo means," a device must operate through the use of feedback, and the accused Milacron robot grippers do not employ feedback. Lemelson does not dispute that the gripper controls on the Milacron robots lack feedback, but contends that they nevertheless fit within the definition of a "servo means" because, according to Lemelson, feedback is not a necessary part of a "servo means." Thus, with respect to element (g), the parties disagree as to the first part of the two-step infringement analysis—ascertaining the proper scope of the claim. Specifically, the parties disagree as to the proper meaning of the claim and specification term "servo means."

As explained above, such a dispute as to the meaning of a particular term in a claim or specification "must be resolved as a question of fact before interpretation of the claim can begin." *Perini America*, 832 F.2d at 584. Since the dispute in this case is presented in a summary judgment context, the question is whether Milacron has demonstrated the absence of any genuine issue of material fact as to the proper meaning of the claim term "servo means." Milacron may discharge its initial burden in this regard by demonstrating that there is an absence of evidence to support Lemelson's interpretation of the disputed claim term. See *Celotex Corp.*, 106 S.Ct. at 2554.

The evidence initially to be considered when defining the scope of a claim is the specification, other claims, and prosecution history. *Howes*, 814 F.2d at 643. Here, both parties focus their arguments on the specification. Although the '904 patent specification makes repeated reference to the claim term "servo," nowhere in the specification is that term or the term "servo means" specifically defined. Milacron and Lemelson each point to different portions of the specification to support their respective proposed definitions of the term "servo means."

Milacron points to the following diagram and related description in the specification:

FIGURE 12 of Re. 26,904

A feed back signal is generated during the operation of the servo motor MJ ... by means of a response potentiometer 409 which provides an error signal at the output of comparator 408 which ... control[s] the operation of said motor until ... the motor will stop with the jaws ... controlled thereby being at a predetermined open or closed condition. (Col. 10, lines 43–51.) This portion of the specification describes an apparatus that employs feedback to control the operation of the gripper and, thus, supports Milacron's proposed interpretation of the disputed claim term.

Lemelson, on the other hand, relies on other parts of the '904 patent specification that at least arguably suggest that a "servo means" does not require feedback. For example, the specification refers to a "reversible electrical gear motor" (col. 3, line 9) interchangeably as a "servo" (col. 11, line 3), a "motor" (col. 3, line 13), and a "servo motor" (col. 3, line 19). The specification does not indicate that a motor should only be considered a "servo" when its operation is controlled through the use of feedback.

When viewed in isolation, this apparent ambiguity in the specification as to the meaning of the term "servo means" would be sufficient to raise a genuine issue of material fact and, thus, defeat summary judgment with respect to element (g). See *Perini America*, 832 F.2d at 584. But when interpreting a claim term, this Court need not limit its inquiry to the specification, other claims, and prosecution history. The Court also can consider other forms of extrinsic evidence such as expert testimony. *Howes*, 814 F.2d at 643; *Moeller*, 794 F.2d at 656. Milacron submits such evidence here in the form of the two Hohn affidavits.

The first Hohn affidavit offers a definition of the term "servo control" that involves the use of feedback. Hohn's definition is as follows:

*A servo control receives actual position feedback signals from the article seizing means as they open or close,* the actual position is compared with the programmed position, and an error or difference signal is used to control a servo motor to change the actual position.

(First Hohn aff., para. 3, emphasis added.) However, the term "servo control" is not found anywhere in element (g). Nor is it apparent that the claim term "servo means" is synonymous with the term "servo control." Indeed, element (h) of claim

12 arguably suggests that a "servo control" is not synonymous with a "servo means," in that element (h) specifically calls for a "control for said servos." The second Hohn affidavit, at para. 3, states that "[w]ithout any feedback signal from them, these robot grippers are not servo operated." But Hohn does not state in his second affidavit whether he is amplifying his previous definition of the term "servo control," or offering a new definition of the term "servo operated."

■ Aside from their lack of clarity, there are two additional and, perhaps, even more fundamental deficiencies in the Hohn affidavits. First, the Hohn affidavits do not discuss the '904 patent specification and, hence, do not "explain away" the portions of the specification that support Lemelson's contention that feedback is not required in an element (g) "servo means." Second, the Hohn affidavits do not focus at all on how Lemelson, the patentee, defined the term "servo means." As explained above, the patentee can be his own lexicographer, and, in order to ascertain the meaning of a claim or specification term, the crucial question to be resolved is how the patentee defined that term. See *Fromson*, 720 F.2d at 1569. Extrinsic evidence in the form of an expert opinion is therefore relevant to a determination of the meaning of a claim term only to the extent that it in some way relates back to the patent and the patentee's use of the disputed term in the claim.

For example, there may be no indication in the patent specification, other claims, and prosecution history that the patentee intended to depart from the common usage of claim or specification terms in the relevant trade at the time of the patent. In those situations, expert testimony that explains such common usage could be instructive in ascertaining the meaning of the claim or specification term. But the affidavits submitted by Milacron do not provide such information. They simply propose a definition of the possibly inapposite terms "servo control" and "servo operated" without purporting to make any connection at all to the patentee's use of the term "servo means" in the claim or in the specification.[8]

■ As explained above, in determining whether summary judgment is appropriate, all significant doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Mingus Constructors*, 812 F.2d at 1390. It may well be that, ultimately, Milacron could demonstrate that a "servo means," as that term is used in the '904 patent, requires feedback. But given the present ambiguity of the specification on this point, which has not been eliminated by the affidavits presented by the parties, there exists an underlying genuine issue of material fact as to the proper definition of the claim term "servo means."

### (2) Element (i)

■ Element (i) relates to the "variable programming means" that is operatively connected to the servo controls for the claimed robot gripper and arm. Element (i) requires that this programming means include a means for generating control signals to the servo controls in "a predetermined sequence." There is no apparent disagreement as to the meaning of any terms in element (i). Rather, the disagreement with respect to element (i) focuses on the second step of the infringement analysis, *i.e.*, whether element (i) reads on the programming means employed in the accused Milacron robots. Milacron contends that the programming means in the Mila-

---

**8.** Milacron is also incorrect in contending that Lemelson's affidavit submitted in response to Hohn's first affidavit should be interpreted as an admission that feedback is a necessary part of an element (g) "servo means." Lemelson's affidavit was submitted in response to Hohn's statement, later retracted, that the Milacron robot grippers employ a motor and switches. Lemelson concluded in his affidavit that element (g) reads on such a motor-switch combination.

In support of this conclusion, Lemelson cited extrinsic evidence that defines the terms "servomechanism" and "regulator" as referring to "a feedback control system." But the terms "servomechanism" and "servo means" are not obviously synonymous to this Court, and Lemelson's contention that feedback is not necessarily required for the element (g) "servo means" is at least arguably supported by the '904 patent specification.

cron robots does not deliver control signals in a "predetermined sequence," while Lemelson contends that it does.

To support its contention, Milacron relies upon the first Hohn affidavit, which provides a brief explanation of the programming means in the accused devices and states the conclusion that the control signals generated by the programming means in the Milacron robots are not delivered in a "predetermined sequence." Hohn states (at para. 5):

> The control system for the Cincinnati Milacron robots does not deliver signals in a "predetermined sequence." The control only stores in memory the endpoints in space between which the tool mount at the end of the robot arm will be moved. Each time the arm moves between endpoints, the computer recalculates the appropriate signals to produce a straight line path for the tool mount between the endpoints at the selected speed. The signals are not "predetermined." They are calculated anew for each robot arm movement. Furthermore, the signals are not sent out in a "sequence," rather, the controls for each arm member and for the tool mount are operated simultaneously to produce coordinated movement resulting in straight line movement of the tool mount through three dimensional space between the endpoints.

In response, Lemelson, in effect, contends that even if Hohn's description of the operation of the programming means is accurate when the robot arm moves from point 1 to point 2, it is incomplete in that it does not describe the movement of the robot arm through three or more points. Lemelson thus argues that the three-point model correctly describes the accused programming means, and that Hohn's conclusions based on the two-point model are inapposite.

According to Lemelson, when the Milacron robot arm moves from point 1 to point 2, and then from point 2 to point 3, the signals that cause movement to point 2 are fed from the computer memory prior to the signals that cause movement to point 3, resulting in a "predetermined sequence" for the feeding of memory control signals to the computer. Lemelson bases this conclusion on Hohn's statement that the Milacron control "stores in memory the endpoints in space between which the tool mount at the end of the robot arm will be moved," and on a similar description of the Milacron robots contained in U.S. Patent No. 3,920,972 (the '972 patent), which Milacron owns and which apparently describes the Milacron robots in issue.[9]

The determination of whether a claim reads on a device is an issue of fact. *Mannesmann,* 793 F.2d at 1282; *Fromson,* 720 F.2d at 1569. Lemelson's characterization of the operation of the Milacron robot as described in the Hohn affidavits and in the '972 patent appears tenable and is sufficient to raise a genuine issue of material fact concerning whether claim element (i) reads on the accused Milacron robots.[10]

### (3) Element (j)

Element (j) also involves characteristics of the "variable programming means." It specifies the way that the claimed programming means controls the robot arm and gripper when an article is transferred by the gripper from one point to another. As explained above, claim 12 calls for three servo means, and for controls for each of these three servo means. Element (j) provides that the programming means controls the robot arm by "control[ling] one of said first and second [servo] controls to effectuate the movement of the seizing head [*i.e.,* the gripper] and article along a first path, thereafter control[ling] the other of said

---

9. The '972 patent indicates that the robot arm and attached gripper can be programmed to move through a cycle of operation which includes movement through a series of predetermined points. Milacron does not dispute Lemelson's assertion that Milacron previously had informed Lemelson that the '972 patent describes the Milacron robots at issue.

10. Milacron did not respond to Lemelson's arguments with respect to elements (i) or (j), either in its reply brief and accompanying second Hohn affidavit or during the oral argument that was transcribed.

first and second servo controls to effectuate the movement of the seizing head and article along a second path...."

■ Relying exclusively on the first Hohn affidavit, Milacron contends that summary judgment is appropriate because element (j) requires the operation of the controls "one at a time to move the seizing head one direction and then another," whereas the Milacron robots at issue operate the controls "simultaneously" to produce "straight line movement." (Hohn aff., para. 5.) Lemelson makes a series of arguments in response, one of which is that when the Milacron robot, as described in the '972 patent, moves according to its set program in a straight line from point 1 to point 2, and then in a separate straight line from point 2 to point 3, it operates in the precise manner described in element (j). Lemelson's argument, set forth in his affidavit, is based upon a reasonable interpretation of the specification of the '972 patent. Lemelson has therefore demonstrated the existence of a genuine issue of material fact as to whether element (j) reads on the Milacron robot programming means.

Thus, at this point, there are genuine issues of material fact as to whether the accused Milacron robots contain elements (g), (i), and (j) of claim 12 of the '904 patent.

Therefore, Milacron's motion for summary judgment as to the '904 patent must be denied.[11]

## C. Champion's Motion for Summary Judgment on the '431 Patent

### 1. *The Patented Invention*

The '431 patent, entitled "Deposition Molding Apparatus and Method," involves a device and method used in the controlled deposition of materials on objects, such as in spray coating liquid materials onto mold walls. The patent specification indicates that molding devices and methods that previously were available employed controls that were affected by human judgment or that could not readily account for variations in coating material or mold shape. The invention described in the '431 patent, however, employs an automatic controller, such as a computer, which may be varied in its operation to regulate several variables, including the positioning of the work piece relative to the sprayer, the movement of the sprayer across the surface of the work piece, and the rate of flow of the coating material through the sprayer.

Claim 1 of the '431 patent is an independent claim[12] that calls for a combination of 10 elements, labeled (a)–(j).[13] The claimed apparatus has a sprayer ("material dispens-

11. Lemelson also contends that summary judgment should be denied because there are genuine issues of material fact as to whether infringement should be found under the doctrine of equivalents. As noted above, under the doctrine of equivalents, infringement can exist even if the accused device is not encompassed within the literal scope of the claims when the accused device "performs substantially the same function in substantially the same way to obtain the same result" as the invention described in the claim. But here, as explained above, there are material facts in dispute with respect to ascertaining the literal scope of the claim. It is therefore premature to attempt to evaluate in a summary judgment context whether the Milacron robots function in an equivalent manner to the apparatus literally described in the claim.

12. Plaintiff alleges that the Champion robot infringes independent claim 1 and claim 6, which is dependent on claim 1. The motions for summary judgment discuss only alleged non-infringement of claim 1. Claim 6 need not be separately addressed. A dependent claim cannot be infringed unless the accused device is also covered by the independent claim. Hence,

if defendants are entitled to summary judgment with respect to claim 1, they would also be entitled to summary judgment with respect to claim 6. See *Teledyne McCormick Selph v. United States*, 214 Ct.Cl. 672, 679, 558 F.2d 1000, 1004 (1977); *Dresser Industries, Inc. v. United States*, 193 Ct.Cl. 140, 150, n. 1, 432 F.2d 787, 792 (1970).

13. Claim 1 provides:

Apparatus for variably depositing material against the surface of a substrate to mold or form said material as a coating or shell thereon comprising in combination:

(a) a material dispensing head operative to form a stream of material and predeterminately direct same therefrom,

(b) a support for said dispensing head,

(c) means for prepositioning said support and a work member adapted to receive and shape material flowed from said head whereby said material may be deposited onto a selected portion of the surface of said member,

(d) means for guiding said support in movement in a plurality of directions to predeter-

ing head") connected to a support, a means for prepositioning the support relative to the work piece to be coated, a means for guiding the sprayer in a desired path of movement across the surface of the work piece, a source of fluid supply, a "servo means" to power drive the sprayer support, a "servo operated means" to induce the flow of fluid from the supply means to the sprayer, and three controls. The first control varies the operation of the power drive "servo means." The second control controls the flow-inducing "servo operated means." The third control is a "master control" which controls the other two controls and the overall operation of the apparatus in terms of varying the location of the sprayer with respect to the work piece, and simultaneously regulating the flow of material from the sprayer to a selected area of the work piece.

### 2. The Accused Devices

There is no apparent dispute as to the structure of the Champion industrial robot in issue, the DeVilbiss/Trallfa robot model TR3000S (the Trallfa robot). The Trallfa robot is an automatic spray painting robot specifically designed to duplicate human painting flexibility for mass production spraying. The Trallfa robot consists of three elements, a manipulator, a control center, and a hydraulic power unit. The manipulator has an arm-like extension with a spray gun at the end of the arm. The arm has six axes of motion, including wrist action. In operation, a human sprayer guides the arm through a spray pattern that is simultaneously entered as a spray program in the control center. When the program is played back to the robot spray parts, the human sprayer's technique can be uniformly duplicated as work pieces pass before the robot. A diagram from Champion's promotional materials that generally depicts the accused device is set forth below.

mine the path of movement of said head across the surface of said member,

(e) servo means for power driving said support on said guiding means,

(f) first control means for varying the operation of said servo means,

(g) supply means for fluent material operatively connected to said dispensing head,

(h) servo operated means for causing flow of fluent material from said supply means to said dispensing head,

(i) second control means for controlling the operation of said fluent material flow inducing servo operated means, and

(j) master control means operatively connected to said first and said second control means to control the operation of said apparatus in a cycle which includes predeterminately varying the location of said dispensing head with respect to said substrate and simultaneously controlling the flow of said material from said dispensing head to predeterminately deposit material onto a selected area of said substrate.

❶ The Hydraulic Power Supply, containing the oil reservoir, electric motor, pump, valve manifold and the air heat exchanger.

❷ A standard bracket for attachment of a spray gun is mounted on one of the turning motors.

❸ The Control Unit containing the main junction box, the electronics rack with the «plug-in» type circuit boards, the control panel with the recording and play-back controls and the tapereader.

❹ The Remote Control Panel containing necessary lamps and push buttons for start/ stop and function controls as well as an emergency stop button.

❺ Hydraulic Servo Actuators for positioning of the manipulator arm. Three linear and two turning actuators allows the arm to emulate the movements of the human sprayer.

In the Trallfa robot, a spray gun at the end of the manipulator arm receives material to be sprayed from a pressure tank or circulating lines. The on/off function of the gun is controlled by a gun trigger solenoid. When the solenoid is opened, air from an a supply source passes through the solenoid and turns on the applicator gun. The solenoid valve is electronically operated by the robot as the robot moves through its programmed maneuvers. The robot controls the flow of liquid only through control of the solenoid. There is no monitoring interface or feedback device between the control system of the robot and the gun trigger, and material flow to the gun is controlled through a mechanical fluid regulator.

Lemelson offers the following diagram of the structure of the Trallfa robot system, which is derived from and apparently is consistent with the description of the system contained in affidavits submitted by Champion and the United States.

Electrical Connection

ROBOT CONTROLLER

AIR PRESSURE SUPPLY

Solenoid Valve

SPRAY HEAD OR GUN

PRESSURE TANK FOR MATERIAL

### 3. *The Claim Elements at Issue*

Champion's primary argument in its summary judgment motion is that the Trallfa robot employs a significantly different structure for fluid control than is called for in claim 1 of the '431 patent. In the claimed structure, three elements are used to move the liquid to be sprayed from the supply source through the spray head: the element (h) "servo operated means for causing flow of fluent material to [the] dispensing head;" the element (i) "control means for controlling the operation of" that "servo operated means;" and the element (j) master controller, which is "operatively connected to," *inter alia*, the element (i) control means. Champion contends that its Trallfa robot system does not use a "servo operated means" as called for in element (h) and, in any event, does not employ two levels of control over the material flow as called for in elements (i) and (j). In addition, as an independent basis for summary judgment, Champion contends that its Trallfa robot system does not perform the functions listed in the preamble to claim 1 and in element (c).

To support its motion for summary judgment, Champion submitted affidavits by two scientists who worked with the Trallfa robot system, Timothy J. Bublick and Daniel J. Hasselschwert. The United States submitted additional affidavits, including one by Marion L. Roberts, a Government scientist familiar with the Trallfa robot system. In opposition to the motion for summary judgment, Lemelson relies upon his own supplementary affidavit.

#### (1) Element (h)

Element (h) calls for a "servo operated means for causing flow of fluent material from said supply means to said dispensing head." Champion's contention, similar to that of Milacron with respect to the '904 patent, is that a "servo operated means" must operate through the use of feedback. Since the Trallfa robot system does not use feedback, Champion contends that it lacks an element (h) "servo operated means." Lemelson responds that (1) a "servo operated means" within the meaning of element (h) does not require feedback, and (2) the solenoid valve in the Trallfa robot system, see Lemelson's above diagram at p. 23, is an element (h) "servo operated means." The parties' contentions thus reveal a fundamental disagreement as to the meaning of the claim term "servo operated means"

and, hence, as to the proper scope of the claim in issue.

As was the case with Milacron's motion for summary judgment with respect to element (g) of the '904 patent, Champion cannot prevail on its motion for summary judgment with respect to element (h) of the '431 patent because the patent specification does not specifically define the disputed claim term "servo operated means," the specification arguably supports both parties' proposed interpretations of the disputed claim term, and the affidavits submitted by the parties do not dispel the ambiguity in the specification.

Champion relies on the description in the specification of Figure 3, which is a schematic diagram of the "master controller." Figure 3 is as follows:

Fig. 3

INVENTOR.
JEROME H. LEMELSON

The specification description of Figure 3 indicates that feedback is employed in certain aspects of the control of the rate of fluid flow. In pertinent part, the specification states that (col. 7, lines 41–54)—

[a] response potentiometer 80 of the type described is coupled to shaft 81 to generate a feed back signal indicative of the rotation of said shaft which signal is bucked against the command signal generated on the input line 76–3 to provide an error signal on the output of controller 77–SMP for controlling the positioning of shaft 81 in accordance with the numerical value of the command control signal. One or more of either or both the described constant or variable output pumps may thus be provided and controlled in their operation to control the flow of one or more deposition materials from respective reservoirs thereof mounted on the crane or provided remote therefrom.

But other portions of the specification arguably support Lemelson's contention that feedback is not a necessary aspect of the element (h) "servo operated means." For example, one of the motors depicted in Figure 3 and used in the control of material flow, motor MP, apparently does not employ feedback. Motor MP, which is referred to in the specification as a "servo

motor" (col. 5, line 58), apparently is controlled directly by the command signal generator; it is not attached to a potentiometer and does not employ a controller analogous to controller 77–SMP.[14]

Lemelson relies on different parts of the specification of the '431 patent to support his contention that, as an alternative to a servo motor, a solenoid valve, such as that used in the Trallfa robots, can be an element (h) "servo operated means." In this regard, the specification (at col. 9, lines 57–65) provides that the pumping means, which apparently encompasses servo motor MP (discussed above), may be replaced by a gas pressurized source of material and by a valve operated by a solenoid. In addition, the specification (at col. 7, lines 69–71) incorporates by reference Lemelson's now-abandoned Patent Application Ser. No. 552,159. In his supplemental affidavit, Lemelson indicates that this application describes a "servo device" that is apparently used in a production machine for spray painting, as follows:

> *A servo device* MF (FIG. 12) is shown operatively controllable by the multi-circuit controller ... and *may comprise a motor or solenoid* which is operative to gate or regulate a fluid to be dispensed. * * * Such a fluid may comprise a paint or coating fluid....

(Lemelson Supp.Aff., para. 8, emphasis added.)

■ These statements in the specification of the '431 patent and in the abandoned application referenced therein appear sufficient to establish a genuine issue of material fact as to whether the term "servo operated means" as used in element (h) encompasses a solenoid that does not

operate through the use of feedback. The affidavits submitted by Champion and the United States do not demonstrate to the contrary.[15] Accordingly, summary judgment on this aspect of Champion's motion is not appropriate.

#### (2) Elements (i) and (j)

As noted above, elements (i) and (j) call for two distinct "control means" that work in conjunction with the element (h) "servo operated means" to control the flow of material to the dispenser head. The element (i) "control means" controls the element (h) "servo operated means," whereas the element (j) "master control means" is "operatively connected to" and controls, *inter alia,* the element (i) "control means" so as to regulate the flow of material from the dispensing head. Champion contends that, even assuming the solenoid valve in the Trallfa robots is an element (h) "servo operated means," the robots nevertheless have only one structure, the Trallfa "robot controller," that can possibly be deemed a controller for regulating material flow. See Lemelson's above diagram at p. 23. Thus, according to Champion, the two distinct "control means" called for in elements (i) and (j) cannot be present.[16]

In response, Lemelson contends that the two "control means" at issue are present in the Trallfa robots. Lemelson contends that the element (i) "control means" is the "electrical connection" between the Trallfa "robot controller" and the solenoid, and that the element (j) "master control means" is the Trallfa "robot controller." The dispute with respect to elements (i) and (j) therefore involves the meaning of the terms in

---

**14.** The '431 patent specification also uses the term "servo" in describing pump motor 46. (Col. 3, lines 29–44.) Pump motor 46 is involved in material flow, but there is no indication in the specification that it operates through the use of feedback.

**15.** Indeed, these affidavits do not even discuss the specification of the '431 patent. As was true of the Hohn affidavits, instead of providing a definition of the claim term in a context that would aid the Court in ascertaining what the patentee meant when he used the term "servo operated means" in element (h) of the claim, the

affidavits submitted by Champion and the United States simply provide the affiants' conclusions that the Trallfa robots do not employ feedback and therefore do not contain the element (h) "servo operated means."

**16.** The element (j) "master control means" must also be "operatively connected to" the element (f) "control means," and must control the movement of the spray head. But Champion does not contend in this summary judgment motion that these aspects of element (j) are absent from the Trallfa robot.

these elements and, hence, involves the first step of the infringement analysis, ascertaining the scope of the claims.

Champion's position that an electrical connection cannot be a "control means" has considerable intuitive appeal in that, at least to this Court, an electrical connection is thought of simply as a conduit for electricity rather than a controller in its own right. But lay intuition can occasionally lead one astray in technological areas and, in any event, as explained above, the patentee has a "verbal license" in defining his claim terms. Thus, the proper issue is how Lemelson defined the disputed claim terms.

As stressed above, the search for the meaning of a disputed claim term commences again with an analysis of the patent documents. With respect to element (i), the specification includes three figures depicting variations of the invention and a description of these figures and of the invention. The specification does not, however, specifically define the scope of the term "control means."

Champion finds considerable support in certain parts of the specification for its position to the effect that the element (i) "control means" covers a distinct control mechanism that receives a signal from the master controller through an electrical connection, as opposed to covering the electrical connection itself. For example, in describing the apparatus depicted in Figure 1,[17] the specification indicates that liquid is pumped to the dispensing head by operation of a pump which is connected to a servo motor. The servo motor has distinct forward and reverse gears which are described in the specification (at col. 3, lines 29–32) as "controls" for the servo motor.

These forward and reverse controls are connected by electrical connections to the command signal generator, *i.e.*, the "master controller." Similarly, in Figure 3, all but one of the servo motors depicted (the exception being motor MP) have forward and reverse gears and/or are connected to distinct mechanisms which are described in the specification as controls or controllers which, in turn, are connected through an electrical connection to the command signal generator.[18]

But while these descriptions in the specification support Champion's position, Lemelson's interpretation of element (i) is arguably supported by the description in the specification of servo motor MP. In Figure 3 of the specification, servo motor MP does not appear to operate in the same manner as the other servo motors described above. It apparently does not have forward and reverse controls and is not connected to any intermediary controller which, in turn, is connected through an electrical connection to the command signal generator. Rather, servo motor MP is connected directly to the command signal generator through an electrical connection, labeled 76–1. Thus, the only structure between servo motor MP and the command signal generator appears to be the electrical connection.[19] The specification does not specifically refer to this electrical connection as a controller. But Champion has not pointed to anything in the specification, other claims, prosecution history, or its affidavits that suggests that the circuitry and structures depicted for the operation of motor MP are not intended to be an embodiment of Lemelson's invention.

---

17. The specification indicates that Figure 1 "illustrates schematically aspects of the molding apparatus of the current invention including *control means therefore*." (Col. 2, lines 25–27.)

18. Figure 3 is described in the specification as "a schematic diagram of the master controller ... employed to control movement and operation of the apparatus of Figure 2." (Col. 6, lines 8–10.) Figure 2 is described as "an embodiment of the invention used to apply a coating to a base." (Col. 2, lines 21–22.)

19. The specification describes the interaction between servo motor MP, electrical connection 76–1, and the command signal generator as follows (col. 7, lines 29–54):

When a signal is generated on the output 76–1 of signal generator 74', it operates pump motor MP driving pump 70 to pump ... deposition material until the line 76–1 is deactivated.... [T]he described ... pumps may thus be provided and controlled in their operation to control the flow of ... deposition materials from respective reservoirs....

 While the issue is close, summary judgment is not appropriate with respect to element (i). The description in the specification of the operation of servo motor MP creates sufficient doubt, not diminished by any materials submitted by the parties, as to raise a genuine issue of material fact regarding whether an electrical connection is within the scope of element (i).

Next, with respect to element (j), that element, in pertinent part, calls for a master control which is "operatively connected to" the element (i) control means to control the flow of material from the dispensing head. The Trallfa robot controller is "operatively connected to" the electrical connection (which arguably constitutes an element (i) control means) and, in conjunction with that connection and the solenoid valve (which arguably constitutes an element (h) "servo operated means"), controls the flow of material from the spray gun to the work piece. In view of this Court's conclusions with respect to elements (h) and (i), Champion has not demonstrated the absence of a genuine issue of material fact with respect to the presence of an element (j) master controller in the Trallfa robot.

(3) The Preamble and Element (c)

Champion also argues that summary judgment should be granted with respect to claim 1 of the '431 patent because, according to Champion, the Trallfa robot system does not perform the functions articulated in the preamble and in element (c) of claim 1. As set forth above, the preamble states that the invention is an "[a]pparatus for variably depositing material against the surface of a substrate to mold or form said material as a coating or shell thereon...." Element (c), in pertinent part, calls for "a work member adapted to receive and shape material flowed from said [spray] head...."

Champion contends that the claimed invention is a "molding apparatus" that produces molded articles of predetermined shape, whereas the Trallfa robot is essentially a spraying apparatus. Champion therefore contends, in effect, that the Trallfa robot does not "variably deposi[t] a material against the surface of a substrate to mold or form the material" as called for in the claim preamble, and that the work member in the Trallfa robots is not adapted to "shape" material as called for in element (c). Lemelson, to the contrary, contends that claim 1 encompasses an apparatus that spray paints a work member. Thus, the dispute again focuses on the proper meaning of specific claim terms, *i.e.*, whether the above claim terms cover spray painting.

To controvert Champion's assertions, Lemelson relies upon statements in the specification that appear to envision use of the invention for spray painting. In pertinent part, the specification states that the spray head "may be directed to *spray* against a vertically disposed surface such as a work piece or wall panel for *painting*, coating or building up plastic or cement thereon." (Col. 9, lines 16–19, emphasis added.) In addition, another portion of the specification describes the work member called for in element (c) as "an elongated, narrow member or plate" and provides that the invention can be used simply for "coating" that member. (Col. 6, lines 21–27.)

 These portions of the specification support Lemelson's proposed interpretation of the relevant claim terms.[20] Champion has not pointed to any other parts of the patent instrument that demonstrate that the claim terms do not encompass spray painting as carried out by the Trallfa robot system, and, as indicated above, the affidavits submitted by defendants do not even mention the specification. Hence, Champion has not demonstrated the absence of a genuine issue of material fact as to the proper interpretation of the claim terms in question. Therefore, summary judgment

20. The terms in the preamble to a claim are deemed limitations in the claim only where necessary to give meaning to the claim and properly define the invention. See, *e.g., Perkin-Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 896 (Fed.Cir.1984); *In re Bulloch,* 604 F.2d 1362, 1365 (CCPA 1979); *Kropa v. Robie,* 187 F.2d 150, 151–152 (CCPA 1951). But it is not necessary at this point to determine whether the preamble should be viewed as limiting here because, in any event, for the reasons set forth above, Champion would not be entitled to summary judgment.

as to this aspect of Champion's motion must also be denied.

### Conclusion

In view of the foregoing opinion, it is hereby ORDERED:

1. Milacron's November 15, 1982, motion to dismiss is denied.

2. Milacron's November 15, 1982, motion for summary judgment is denied with respect to the '904 patent. Milacron's motion with respect to the '431 patent will be resolved in a separate order.

3. Champion's January 19, 1983, motion for summary judgment is denied.