**NPD RESEARCH, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 457–85C.

United States Claims Court.

June 23, 1988.

114

Lawrence G. Kurland, New York City, for plaintiff; Stiefel, Gross, Kurland and Pavane, of counsel.

Harry E. Barlow, Dept. of Justice, Civ. Div., Washington, D.C., for defendant; with whom was John R. Bolton, Asst. Atty. Gen. Thomas J. Byrnes, Dept. of Justice, of counsel.

## OPINION

ROBINSON, Judge.

This patent infringement suit is before the court on the plaintiff's combined Motion for Summary Judgment of Infringement under RUSCC 56 and 35 U.S.C. § 271, and for a Declaratory Summary Judgment of Infringement under RUSCC 56 and 57 and 28 U.S.C. § 1491 and 35 U.S.C. § 271. The plaintiff, NPD Research, Inc., (NPD), by complaint filed August 7, 1985, in this court seeks "at least" $6,300,000 in damages on the grounds that the defendant has infringed the methods of claims 1, 2, 5–7, and 10–17 of U.S. Patent No. Re. 31,951 (the '951 patent) by the use of methods employed during a pretest survey (pretest) performed for the United States Department of Agriculture's (USDA) Human Nutrition Information Service (HNIS) by Creative Associates (CA) and that HNIS's 1987–88 Nationwide Food Consumption Survey (NFCS '87) is infringing these methods as it is performed. This HNIS survey is ongoing and is scheduled for completion by late 1988. Defendant opposes the combined Motion for Summary Judgment

and for a Declaratory Summary Judgment of Infringement but has not also moved for summary judgment. It contends that there are genuine issues of material fact in dispute that prevent resolution of the infringement issue by summary judgment, but contends the '951 patent is invalid and is therefore not subject to infringement.

The court, after a careful review of the pleadings and oral argument of the parties, finds that there is at least one genuine issue of material fact in dispute which precludes resolution of this matter by plaintiff's combined motion for summary judgment and declaratory summary judgment of infringement. The reasoning of the court follows.

### Factual Background

NPD, a New York corporation engaged in all phases of market research, was the owner of United States Letters Patent No. 4,355,372 issued October 19, 1982, by virtue of an assignment recorded in the United States Patent and Trademark Office (TMO) on December 24, 1980. On February 10, 1984, plaintiff reexamined its patent. Believing that Patent '372 was "inoperative or invalid" because of narrow claims 1–9, on March 7, 1984, plaintiff filed an application for reissue of Patent '372, which after surrender of that patent material, was issued July 16, 1985, as Reissue Patent No. Re. 31,951. Reissue Patent '951, in addition to containing reissue claims 1 through 9 which omit the unduly narrowing limitations which were present in the original claims of Patent '372, contains additional claims. Basically, the Original and Reissue Patents describe a computerized method for collection of specific types of market survey data and transmission of that data to a central point for analysis.

Since 1936, the USDA has conducted food surveys to measure the use of various food products in the home. Although the name of the present survey uses the term "consumption," this is misleading since "use" information, which concerns removal of the particular product from the home food supply, only is sought in the survey.

The surveys are conducted at approximately 10–year intervals by interviewing about 10,000 selected households regarding their food usage during the immediately preceding 7–day period. In earlier surveys, the questions asked during the interview were set forth in a printed questionnaire. Because the recall of the respondent is a critical element of the NFCS, each question is designed to trigger the recall of the respondent through its association with other questions and responses. The questions and the format of the questionnaire have remained essentially the same since at least the 1965 NFCS. Up through the 1977–78 NFCS, the questionnaire was taken to a household by an interviewer who read the questions to the household respondent and manually recorded the responses thereto in the questionnaire. The data were later extracted from the questionnaire and used to prepare the survey results.

In 1976, USDA began to develop methods to automate the NFCS and thereby eliminate the paper questionnaire by storing the standard questions in a computer, having the computer display, during the interview, the questions as they were read to the respondent and storing the responses thereto in the computer for subsequent retrieval. The first automated methods at USDA used computer programs (software) written by USDA employees for a general purpose Datapoint desktop computer because portable computers having sufficient memory were not available. During 1976, USDA's software was tested using a representative sample of the standard questions. The defendant contends that the USDA testing in 1976 showed the concept of automating the NFCS through the use of computers was feasible.

Subsequently, USDA purchased several general purpose CDI computers, modified its standard questions for installation in these computers, and tested the CDI system extensively using its employees as respondents. During 1979–80, USDA contracted with National Analysis (NA) to conduct a field test of the CDI system during which approximately 80 interviews were conducted. According to the defendant,

the field test "worked well" and "verified the concept of an automated NFCS."

However, the interview procedure using the CDI system had several equipment related drawbacks: (1) the storage capacity of the CDI computer was only 32K bytes which was insufficient to hold at one time all the standard questions, making it necessary to load by tape the questions into the CDI computer during the interview; (2) the CDI computer display was a built-in printer which, because the standard questions were somewhat lengthy, caused additional delay; and (3) the CDI computer was bulky and heavy.

In 1983, the USDA, through an SBIR program, had plaintiff, as a subcontractor to the firm of JWK, conduct a small pilot study employing NPD's methodology. The results of this test confirmed again that automated collection of survey data was feasible.

USDA continued to experiment with methodology for automated collection of survey data. USDA purchased the Teleram general purpose computer when it became available in 1984 because it was lighter, less bulky, faster, and more powerful. The USDA modified its software to be compatible with the Teleram computer using an abbreviated version of the standard questions. The defendant states it successfully tested the Teleram computer in 1985 at USDA.

The USDA and Creative Associates (CA) in 1986 conducted a "pretest" of the Teleram system in 60 in-home interviews. This pretest involved a display of the questions on the screen. The questions concerned food products used during the immediately preceding 7–day period. If the respondent indicated that a particular food product such as beef was used, then follow-up questions were asked about the quantity, form (freeze dried, frozen, fresh), source (purchase, gift, Meals–On–Wheels), and in some cases, price paid.

The questions and responses relating to a particular product were displayed simultaneously on the screen for consideration as a group. The interviewer was able to revise the data either by reentering the data or by selectively modifying the data. Once the interviewer and the respondent were satisfied that the data were accurate, the interviewer entered or "wrote" these data as a group into the Teleram's memory. Upon completion of this step, a question concerning the next food product appeared on the screen, was posed to the respondent, and the above procedure was repeated. After the interview, the interviewer took the Teleram computer to another location and transmitted the stored data by telephone to a central computer for further processing.

In September 1986, USDA contracted with National Analysts (NA) to perform the NFCS '87. The NFCS '87 consists of an automated survey and a non-automated follow-up by the interviewer. During the automated portion, NA uses a general purpose, off-the-shelf, portable Toshiba 1100–plus computer and its own software to conduct the in-home interview. During the non-automated follow-up, the interviewer is required to obtain prices on all food products for which the respondent fails to provide prices. Both the automated data and non-automated data are transmitted to NA's central facility by U.S. mail.

### The Claims of the Patent

The methods claimed in the patents in suit involve in their preferred embodiment small, portable, hand-held computers that are placed in homes where the homemaker-panelist uses a scanning wand to read Uniform Product Code labels (UPC) and a number pad to collect product identification and purchase demographic data. The methods also include simple coded prompts which guide the user through the data entry sequence. The '951 patent, in claim 1, sets forth the following:

A.  A method for independently, electronically collecting related market data from a plurality of diverse locations for storage at each of said diverse locations

B.  where said data is independently collected for subsequent transmission thereof from said diverse locations over a telephone type link for accu-

mulative processing thereof at a remote central electronic data processor

C. said method at said data collection diverse locations comprising the steps of electronically responding to a prompt message at said diverse location indicating a particular one of a plurality of market survey information categories in a predefined sequence of said categories,

D. said categories comprising at least product identification data and purchase demographic data;

E. providing a market survey data input signal to a buffer storage means in response to said prompt message,

F. said provided market survey data input signal comprising an actual data input corresponding to said particular category;

G. selectively, interactively processing said provided market survey data input at said diverse location in a microcomputer means in accordance with said predefined sequence,

H. providing a verification signal corresponding to said actual data input in response to the input thereof at said diverse location for verifying entry of said actual data input;

I. providing a confirmation command input signal to said microcomputer means in response to said verification signal; and

J. independently storing said particular category market survey data input signal content of said buffer storage means in a static memory means at said diverse location in response to said confirmation command input signal and

K. responding to the next prompt message in said predefined sequence in response to said confirmation command input signal for providing a next storable corresponding market survey data input signal in response to said next prompt message,

L. said sequence defining a market survey data transaction,

M. said interactive sequence recycling for each market transaction for enabling independent integral storage of each transaction at said diverse location.

### The Contentions of the Parties

The plaintiff contends that the 1986 pretest and the NFCS 1987 program infringe the claims of its patent, specifically Reissue Patent claims 1, 2, 5–7, and 10–17. Plaintiff's arguments place significant reliance upon the affidavit of Seymour Sudman (Sudman), a specialist in performing market surveys and presently a professor of marketing at the University of Illinois at Urbana–Champaign. Sudman's conclusion is that each of the items in claim 1 of the Reissue Patent appears to be present in the methodology employed by the USDA and, further, that all remaining, dependent claims 2, 5–7, and 10–17, are also infringed by the methodology contemplated by the NFCS '87 program. Plaintiff contends the claims of the patent are clear, and that the methodology employed by the USDA in its pretest and NFCS 1987 programs is clear from the evidence presented. Plaintiff thus argues that the case is ripe for summary judgment on the issue of infringement because there cannot be any material issues of fact in dispute on the record presented, and that no trial is necessary.

The defendant contends that there is a genuine issue of material fact with respect to construction of the claims in dispute as shown by affidavit of Brucy C. Gray, the defendant's expert. Further, defendant argues that there exist material facts in dispute with regard to the description of the accused surveys, the infringement of the claims, and the validity of the claims. Defendant alleges that Sudman's affidavit is insufficient to show there is infringement since he did not review the prosecution file or the prior art when he construed the claims of the patents and he relies not on the surveys themselves, but outdated documents which do not accurately describe those surveys. Finally, defendant contends plaintiff's motion for declaratory summary judgment regarding the

NFCS '87 survey should be denied because the court does not have jurisdiction to grant any relief for prospective patent infringement.

*Discussion*

Summary judgment is appropriate only when the motion and its supporting materials show that there is no genuine issue as to any material fact in dispute and the movant is entitled to judgment as a matter of law. RUSCC 56; *see Molinaro v. Fannon/Courier Corp.*, 745 F.2d 651, 653–54 (Fed.Cir.1984). It is the plaintiff's burden as the moving party, to demonstrate the absence of genuine issues of material fact. *Cooper v. Ford Motor Co.*, 748 F.2d 677, 679 (Fed.Cir.1984). The trial court must view the evidence in a light most favorable to the non-movant, in this instance the defendant, and draw all reasonable inferences in its favor. *SRI International v. Matsushita Electric Corporation*, 775 F.2d 1107, 1116 (Fed.Cir.1985). Because infringement is itself a fact issue, a trial court must approach a motion for summary judgment of infringement or non-infringement with a degree of care proportioned to the likelihood of its being inappropriate. *Id.* at 1116.

Patent infringement analysis involves a two-step process. First, the court must ascertain the scope of the relevant claims. After the court has construed the scope of the claims, the court determines whether the claims as so construed cover the accused device. *Lemelson v. United States*, 14 Cl.Ct. 318 (1988); *Palumbo v. Don–Joy, Co.*, 762 F.2d 969 (Fed.Cir.1985). The two steps are distinct. "It is only after the claims have been construed without reference to the accused device that the claims, as so construed, are applied to the accused device to determine infringement." *Lemelson*, 14 Cl.Ct. at 322, citing *SRI International*, 775 F.2d at 1118.

The fundamental issue when determining the scope of a claim is how the inventor defined the terms in the claim. *Lemelson*, 14 Cl.Ct. at 322. The inventor is his own lexicographer; he is free to define his claim terms in any way he choos-

es. *Id.; Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565 (Fed.Cir.1983). Thus, the issue is generally resolved from the perspective of one skilled in the relevant technological area. "Claims are normally construed as they would be by those of ordinary skill in the art." *Lemelson*, 14 Cl.Ct. at 322, citing *Fromson*, 720 F.2d at 1569.

The first step in the infringement analysis, defining the scope of the claim, involves a question of law. *Lemelson*, 14 Cl.Ct. at 322; *Moeller v. Ionetics, Inc.*, 794 F.2d 653 (Fed.Cir.1986); *McGill, Inc. v. John Zink Co.*, 736 F.2d 666 (Fed.Cir.1984), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984); *SSIH Equipment S.A. v. U.S. International Trade Comm'n.*, 718 F.2d 365 (Fed.Cir.1983). However, if a dispute arises as to the meaning of a particular term in the claim or in the patent specification, a question of fact exists. "If the meaning of the terms in the claim, the specification, other claims or the prosecution history is disputed, that dispute must be resolved as a question of fact before interpretation can begin." *Perini America, Inc. v. Paper Converting Machine Co.*, 832 F.2d 581, 584 (Fed.Cir. 1987). Thus, in resolving a dispute as to the scope of a claim, the court is obligated to consider the patent specification, the other claims in the patent, and the patent's prosecution history. *Lemelson*, 14 Cl.Ct. at 322. The court may also consider other forms of extrinsic evidence, such as expert testimony, *Id.; Moeller*, 794 F.2d at 656, or texts, such as dictionaries, explaining usage of the disputed claim terms.

In the second step of the infringement analysis, the court analyzes both the structure and operation of the accused device or method to determine whether it is encompassed by the properly interpreted patent claim. *Lemelson*, 14 Cl.Ct. at 323. The application of the properly interpreted claim to the accused device or method involves issues of fact. *Id.* Infringement typically results if the device or method embodies every element of the claim. *Id.* However, if the alleged infringer can show

that the accused device or method "is so far changed in principal from a patented article that it performs the same or similar functions in a substantially different way," infringement is avoided under the "reverse doctrine of equivalents." *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608–09, 70 S.Ct. 854, 856–57, 94 L.Ed. 1097 (1950). Even where the accused device or method does not contain every element in the claim, and the claim does not "read on" the accused device or method, infringement may result under the "doctrine of equivalents." To infringe under the "doctrine of equivalents," the accused device or method must "perform substantially the same function in substantially the same way to obtain the same result" as the claimed invention. *Id.; Lemelson*, 14 Cl.Ct. at 323.

In the instant case, language in the claim is in dispute as to its meaning. Specifically, the meaning of the term "purchase demographic data" in Step D of the claim is disputed by the defendant's expert, Brucy C. Gray, Chief of the Survey Statistics Branch, HNIS, USDA.

According to the plaintiff's expert Professor Seymour Sudman, the term "purchase demographic data," which appears throughout the claims, is a category of collected market survey information. In his opinion, the "term clearly refers to what people in the field would commonly refer to as the characteristics of the purchase, such as, for example, quantity, total price, unit price, how the product was obtained, where the product was purchased, whether a discount or coupon was involved, and the day of the week purchased." Because Professor Sudman believes the terminology of the claim is so clear, he admits that he did not review the prosecution history of the '951 patent.

On the other hand, defendant's expert contends that the term "purchase demographic data" is much narrower than represented by plaintiff's expert. In his affidavit, Mr. Gray claims that the definition of "purchase demographic data" employed by the plaintiff's expert is "not consistent with usage of purchase demographic data by the

patentees in the '372 original patent, the '372 prosecution history, its use in the description of the '951 patent that precedes the claims (the specification) or its definition as used by those skilled in the art of market research." By reviewing the specification in conjunction with claim 1 of both the original '372 patent and the '951 reissue patent, the defendant's expert concludes that the term "purchase demographic data" as used in the '951 patent means only the day of purchase and the store where the purchase is made. Thus, defendant's expert states that the term clearly does not describe the product itself as represented by Professor Sudman.

Plaintiff counters that the defendant, in an effort to raise a "straw man," has not proved that the term "purchase demographic data" is disputed. Further, plaintiff argues that the defendant's expert does not possess the requisite expertise in the field of market research and is biased. The court, however, disagrees with the plaintiff and finds that plaintiff, as the moving party for summary judgment, has failed to demonstrate the absence of a genuine issue of material fact.

"In determining whether a genuine factual issue exists, the judge's 'function is not himself [sic] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Big Chief Drilling Co. v. United States*, 15 Cl.Ct. 295, 299 (1988), citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). Thus, for summary judgment to be denied, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a ... judge to resolve the parties' differing versions of the truth at trial." *First National Bank of Arizona v. Cities Services Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–1593, 20 L.Ed.2d 569 (1968). The defendant has presented by affidavit of its expert, Brucy C. Gray, sufficient evidence that the term "purchase demographic data" as used in claim 1 of the '951 patent is in dispute. This dispute must be re-

solved before the court can define correctly the scope of the claim and before the court can consider the issue of infringement. The grant of summary judgment in this instance would deprive the court of an opportunity to ask questions of the experts to clarify its understanding of a highly technical and fact intensive case before making its decision, and would be clearly improper. *Anchor Estates v. United States*, 9 Cl.Ct. 618, 622 (1986). Therefore, the court denies plaintiff's motion for summary judgment of infringement.

■ The plaintiff has also moved for declaratory judgment for prospective infringement. The defendant argues that this Court, under 28 U.S.C. Section 1491, has no jurisdiction to grant such a declaratory judgment. No comprehensive analysis is needed to dispose of this motion. There is no specific provision of law cited by the plaintiff commanding that the United States pay plaintiff any money nor has plaintiff alleged that an express or implied contract between the plaintiff and the United States exists requiring the payment of any amount of money to the plaintiff for breach thereof nor has plaintiff claimed the United States improperly exacted or retained money due the plaintiff. In these circumstances, the Claims Court has no power to grant declaratory relief under Section 1491. *Eastport S.S. Corp. v. United States*, 178 Ct.Cl. 599, 372 F.2d 1002, 1008 (1967); *Busby School of Northern Cheyenne Tribe v. United States*, 8 Cl.Ct. 588 (1985). The cases cited by plaintiff in support of its motion, *Ellis v. United States*, 610 F.2d 760 (Ct.Cl.1979) and *Wheeler v. United States*, 3 Cl.Ct. 686 (1983), are inapposite and have no application to prospective patent infringement.

"[T]he United States as sovereign, 'is immune from suits save as it consents to be sued ... and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'" *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 769–770, 85 L.Ed. 1058 (1941). Section 1498 is the sole remedy available to a patentee for the unauthorized use of a patent by the United States. *Decca, Ltd.*

*v. United States*, 190 Ct.Cl. 454, 420 F.2d 1010, (1970), *cert. denied*, 400 U.S. 865, 91 S.Ct. 102, 27 L.Ed.2d 104 (1970). Under Section 1498, when the government makes unauthorized use of a patent, it is deemed to have taken a license in that patent. "The license taken at [a given] instant covers only what the government is using or has manufactured as of that instant." *Id.* Thus, the United States has not waived its sovereign immunity with respect to prospective patent infringement. While the NFCS '87 has been completed for the most part, the survey is continuing and will not be completed fully until late 1988. At least for that part of the NFCS '87 survey which has not been completed, this court has no jurisdiction to entertain a suit under Section 1498 for infringement. Therefore, the court denies the plaintiff's motion for declaratory summary judgment both as to the pretest survey and the completed and uncompleted portions of the NFCS '87 survey.

### Conclusion

The court finds that there is a genuine issue of material fact regarding the meaning of the term "purchase demographic data" in claim 1 which is in dispute. In this circumstance the court is precluded from granting summary judgment and thus denies the plaintiff's motion for summary judgment of infringement. In addition, the court denies plaintiff's motion for declaratory summary judgment of infringement as beyond this court's jurisdiction. The parties are directed to file no later than July 15, 1988, a joint status report proposing further proceedings including dates for completion of discovery, the pretrial conference, submissions required under Appendix G of RUSCC, and trial.

IT IS SO ORDERED.