**Bert O. JONSSON, Besam AB and Besam Inc., Plaintiffs,**

v.

**The STANLEY WORKS, Defendant.**

**The STANLEY WORKS, Plaintiff,**

v.

**BESAM, INC., Defendant.**

**Nos. C85–357, C86–2026.**

United States District Court,
N.D. Ohio, E.D.

April 28, 1989.

---

25. In their response to Red River's motion for a change of venue, plaintiffs point out that Mrs. Kervin's primary treating physician resides in this district near Beaumont; another physician who examined her resides in Houston. Plaintiffs have also identified two eyewitnesses who reside in this district and in Arkansas. Finally, plaintiffs themselves reside near Beaumont.

Thomas D. Lambros, James J. Maune, Brumbaugh, Graves, Donahue & Raymond, New York City, Albert J. Knopp and Thomas Shunk, Baker & Hostetler, Cleveland, Ohio, for Jonsson and Besam.

Peter L. Costas, Costas & Montgomery, P.C., Hartford, Conn., Christopher B. Fagan, Fay, Sharpe, Fagan, Minnich & McKee, Cleveland, Ohio, for Stanley Works.

## MEMORANDUM OPINION AND ORDER

LAMBROS, District Judge.

This is an action for patent infringement under 35 U.S.C. § 271. This Court has jurisdiction under 28 U.S.C. § 1338(a). Plaintiffs Jonsson, Besam AB and Besam, Inc. allege that acts of infringement occurred in this district and as defendant has a regular and established office for the transaction of business in this district, venue is proper.

Plaintiffs' action (C85–357), filed in this district in 1985, charges defendant with infringement of plaintiffs' U.S. Patent No. 4,467,251 (the '251 patent). The Stanley Works counterclaimed for a declaratory judgment that the patent is unenforceable, invalid and not infringed. The Stanley Works filed an action in the District of Connecticut (eventually transferred to this Court and docketed as C86–2026) alleging that Jonsson's U.S. Patent No. 4,560,912 (the '912 patent), a continuation of the '251 patent, was invalid, unenforceable, and not infringed by Stanley, and further sought relief for alleged unfair competition by Besam, Inc. The two cases have been consolidated.

Presently before the Court is Stanley's motion, filed December 2, 1988, for partial summary judgment of non-infringement. Plaintiffs (herein "Jonsson") and defendant ("Stanley") have filed extensive briefs in support of their respective positions, with pertinent exhibits attached.

Although the Court recognizes that summary judgment in the field of patent litigation is not common due to the frequently technical nature of the subject matter, both the Sixth Circuit and the Federal Circuit have indicated that summary judgment of non-infringement is appropriate where there are no genuine issues of material fact and when the Court, without the aid of expert opinion, can determine that the accused device does not infringe on the patents in suit. *Scharmer v. Carrollton Mfg. Co.*, 525 F.2d 95, 103, 187 U.S.P.Q. 736, 742 (6th Cir.1975); *Barmag Barmer Maschinenfabrik v. Murata Machinery Ltd.*, 731 F.2d 831, 836, 221 U.S.P.Q. 561, 565 (Fed.Cir.1984). Upon review of the record, the Court determines that this is such a case.

The Court has read the submitted briefs and other documentary materials, which it finds to have properly defined and elucidated the issues. In addition, the Court has heard oral arguments addressed to the pending motion. Having carefully considered the submitted materials, the appropriate principles of law, and the contentions of the parties, this Court finds there are no genuine issues of material fact present herein and that defendant has satisfied the burden of proof under Fed.R.Civ.P. 56(b) in arguing its defense of non-infringement. Accordingly, defendant's motion is granted.

*The Subject Matter of the Patents in Suit*

Jonsson's United States Patent No. 4,467,251, entitled "Object Sensing De-

vice," was issued August 21, 1984. The named inventor is Bert O. Jonsson, a resident of Vintrie, Sweden. Jonsson granted a license to Besam AB, a Swedish company. Besam, Inc. a Connecticut corporation is wholly owned by Besam AB, and has a sub-license under the '251 patent.

The subject matter of the patent in suit is an automatic door opening system of the type commonly found in supermarkets, hotels and hospitals. The device utilizes infrared proximity sensors on both sides of the door. The sensor on the non-swing side of the doorway (the "approach" sensor) generates a presence signal for opening the door when it detects a pedestrian approaching the doorway. The sensor on the swing-side of the doorway (the "safety" sensor) generates a signal for keeping the door from opening, or for keeping a partially open door from being opened further when the sensor detects a pedestrian on the safety side of the door who might otherwise be struck. The approach sensor also prevents the door from closing on someone passing through the doorway. The signals generated by the approach and safety sensors are transmitted to a door controller which operates a motor to open and close the door.

The sensors of other types of automatic door installations (the "prior art") feature pressure sensitive floor mats, interrupted light beams (where the door-opening signal is produced when a person blocks the beam), microwave proximity sensors as well as various arrangements of infrared sensors. Jonsson's door control system (commercially marketed as "visionpulse") consists of two horizontal bar sensor units extending across both sides of the door. Each bar consists of at least one horizontal row of infrared emitters and at least one horizontal row of infrared detectors. The '251 and '912 patents (appendix A) indicate that in each bar unit, the emitters emit wide angle (90 degree) diverging and overlapping fields of view (figures 1 and 4). In each unit, all of the infrared emitters are pulsed together in order to produce a field of radiation generally uniform along the entire length of the door. The zone of coverage is depicted in figure 4 (as viewed

from the side) and in figure 5 (as viewed from above). All of the detectors are active at the same time when the emitters are pulsed so as to collectively detect reflected radiation from all directions along the length of the bar unit. A proximity signal is generated when the reflected radiation received by all of the detectors reaches a certain threshold level.

### The Claimed Invention of the Patents in Suit

Each of the Jonsson patents has one independent claim. The '251 patent also has 3 dependent claims (2–4); the '912 patent has 9 dependent claims (2–10). Claim 1 of the '251 patent, which defines the principle of operation of Jonsson's Visionpulse unit, reads as follows:

1. Control apparatus for an automatic door having motor operated means for swinging said door open in a selected first direction path from a door frame in response to the approach of an object from a second direction, and for inhibiting operation of said motor operated means in response to the presence of an object in said first direction path of said door, comprising:

a first object sensing apparatus, mounted on said door and facing said first direction;

a second object sensing apparatus, mounted on said door and facing in said second direction;

said first and second sensing apparatus each comprising a plurality of elements, each for emitting a diverging beam of diffuse radiation in response to supplied electrical signals to all of said elements, a plurality of radiation detecting elements for receiving radiation reflected from an object, and a receiver connected to said detecting elements for providing an output signal representative of the presence of an object;

and a control circuit for:

(1) activating said motor means to open said door in response to the output signal from said second sensing apparatus;

(2) activating said motor means to maintain said door in an open position in re-

sponse to the output signal from said second sensing apparatus, and

(3) inhibiting operation of said motor means and preventing opening of said door in response to the output signal from said first sensing apparatus.

In Jonsson's '912 patent, the following changes to Claim 1 were allowed: First, the description of the radiation sources was changed from "a plurality of elements, each for emitting a diverging beam in response to supplied electrical signals" to "means for emitting a diverging beam of diffuse radiation in response to a supplied electrical signal." Second, the description of the electrical signal generating component was changed from "simultaneously supplying electrical signals to all of said elements" to "means supplying an electrical signal to said emitting means". Third, the description of the detection component was changed from "a plurality of radiation detecting elements for providing an output signal representative of the presence of an object" to "radiation detecting means for providing an output signal representative of the presence of an object". Resolution of defendant's motion depends on the interpretation of the language in Claim 1, and on the arguments made by Jonsson in defining the scope of his claimed invention during proceedings in the Patent and Trademark Office.

*Construction of the Invention as Presented by Plaintiff During the Prosecution of his Application for the '251 and '912 Patents*

The contents, though not the ultimate meaning, of the '251/'912 "file wrapper," or history of the prosecution of the patent, are undisputed. Jonsson needed to convince the Patent Office that his invention was distinguishable from the prior art, most notably, the Scoville Patent, United States Patent No. 3,852,592. (Defendant's Exhibit BB). Scoville disclosed the illumination of approaching objects through the use of one emitter and one detector to create a diverging beam of ultraviolet light.

Jonsson's invention was first patented in Sweden. *See* Defendant's Exhibits H and I. As filed, Jonsson's United States appli-cation, filed on May 30, 1980, contained 18 claims: Claims 1–15 were directed to the object or obstacle detecting apparatus without any specific type of application, and Claims 16–18 were directed to control apparatus for a swing door utilizing two of the object sensing devices, one on each side of the door. The Examiner eventually allowed Claims 16–18, but rejected Claims 1–15.

In the Disclosure Statement (Defendant's Exhibit J) submitted in the Parent Application, Jonsson brought to the attention of the Patent Office prior art which he considered distinguishable from his invention. Jonsson stated "some of the prior art systems, such as U.S. Patents 3,889,118 and 3,875,403 show systems which include a plurality of emitters and detectors. These systems are, however, of the light path interruption type, and use *sequential* emission from the various light sources," (emphasis added).

The U.S. Patent Office Examiner rejected all the Claims in the application as unpatentable over prior art. (Defendant's Exhibit K). In Jonsson's May 19, 1981 response to the rejection, Jonsson amended the specifications to specify that the sensing apparatus was one "using a plurality of overlapping light beams forming diffuse light", and to specify that the object is illuminated "with diffuse light" and that the receivers detect the reflected "diffuse light". (Defendant's Exhibit L–1).

Also in response to the rejection, Claim 1 of the Parent Application was amended to specify that the plurality of radiation emitting elements were arranged to "simultaneously radiate a diverging beam" and functioned by "collectively illuminating said region with overlapping diverging beams forming diffuse light, whereby an object within said region is illuminated with diffuse light originating from a plurality of said emitters." (Defendant's Exhibit L–1). Claims 2, 9, 15 *and 16, which became Claim 1 of the '251 patent,* were likewise amended to emphasize that the assembly provided the emitting elements with "simultaneous" electrical signals to create overlapping beams and "diffuse radiation".

Along with the proposed amendments, Jonsson's attorneys defined "diffuse" and attempted to persuade the Patent Office of the patentability of the claimed invention over the prior art:

As set forth in claim 1 through 15, applicant's invention is a new object sensing apparatus which makes use of a plurality of light emitting elements operating collectively in combination with a plurality of light sensing elements, also operating collectively. Of primary importance in distinguishing applicant's invention from the art of record, is the fact that the elements for emitting and receiving light operate collectively to radiate and respond to light which is diffuse in nature. The specification is amended as set out above to clarify the nature of the emission of the apparatus described, and to bring out the distinctions over the art of record. Since the changes in the specification merely further describe the results achieved by the structure originally disclosed in the application, no questions of new matter are raised.

(Defendant's Exhibit L-1, pages 6-7). Sketches were submitted to illustrate the manner in which simultaneous illumination from many emitters creates "diffuse" light:

Accordingly, an object within the area of illumination of this diffuse source receives light from many directions, independent of the nature or orientation of the reflector. Because of this operative principle, there is a smaller variation in detector sensitivity as a function of object reflectivity when the object is within the illumination zone. When objects are outside of the illumination zone, the diffuse nature of the emitters and the diffuse nature of the reflected light tends to reduce the probability of undesired long range detection. [Defendant's Exhibit L-1, page 8.]

\* \* \* \* \* \*

*An important distinction between the present invention and the Scoville disclosure is the fact that the present invention uses diffuse light, originating from many sources, to illuminate a region of space.* Scoville suggests at column 3, lines 37 to 45 that multiple emitters may be used. Such use of multiple emitters is to supplement the region covered by a single emitter and the illumination of an object in the control zone by multiple emitters is not required for operation of the system. Object detection according to the Scoville disclosure may be achieved using a single emitter and a single detector ... In contrast, applicant's system requires the use of multiple emitters *and multiple detectors,* all radiating or receiving energy from the same region of space. [Defendant's Exhibit L-1, pages 9-10, emphasis added.]

\* \* \* \* \* \*

None of the references [to prior art, cited by the Examiner] address the unique control apparatus for an automatic door which is the subject of claim 16. The control apparatus, which uses object sensors mounted on opposite sides of the door for the control of a swinging door is considered to be a unique system, *made possible by applicant's novel and effective object sensing device.* [Defendant's Exhibit L-1, page 11, emphasis added.]

In a June 5, 1981 interview with the Examiner, Jonsson's attorney discussed the meaning of "diffuse" and presented arguments contrasting sequential with continuous operation. (Defendant's Exhibit M). In a supplementary response dated August 7, 1981, Jonsson's attorneys addressed the Examiner's concern about the addition of the words "diffuse" and "simultaneous" in the proposed amendments.

... the Examiner noted the addition of the term "diffuse" to the specification and claims of this application. This term has been added in an effort to more accurately describe the nature of the illumination which is provided by the array of cooperatively acting light sources, which is described in this application. It is submitted that the addition of the term diffuse does not constitute new matter in the application, because the term inherently describes the nature of the illumination which is provided by the apparatus described. Submitted herewith is a

copy of an excerpt from Webster's Third New International Dictionary, which includes a definition of the adjective "diffuse". The dictionary indicates a definition six, applicable to radiation, that the word diffuse means "moving in many directions". Since applicants's [sic] device illuminates an object from sources of light which are spread out, as set forth in the claims and drawings of the application, the illumination of that object is inherently diffuse, that is, moving in many directions. This is the result of the fact that the illumination from each of the many light sources is incident on the object from a different direction ... it is appropriate to use this term in the claims so that the claims can more distinctly set forth the invention and distinguish the invention over the prior art of record. [Defendant's Exhibit N.]

Despite the dictionary definition submitted on August 7, 1981, Jonsson's attorneys subsequently continued to emphasize their earlier definition of "diffuse light." Diffuse light requires "a *plurality* of sensing elements which *simultaneously* respond to diffuse reflected light ..." (Defendant's Exhibit N, page 9 of the December 7, 1981 proposed amendments to Claims 1, 2, 9, and 15, emphasis added). "In order to bring out this distinction, the rejected independent claims have been amended, as set forth above, to provide that the emitted beams have all substantially the same direction. This is clearly different from the arrangement of Gayring [a patent of prior art] where each of the emitters 20 illuminates essentially one-half of the region of sensitivity, and each is oriented in a different direction." (*Id.*, page 8.)

And in the brief filed in the appeal from the final February 8, 1982 rejection of Claims 1–15, Jonsson's attorneys defined the sensing apparatus as follows:

Appellant's inventive apparatus includes a distributed transmitter comprising a plurality of discrete radiation emitting elements (14, Figs. 1 and 7), such as light emitting diodes, each simultaneously-radiating a diverging beam of radiation ... the beam provided by each element oriented in substantially the same beam direction and overlapping beams provided by neighboring elements. Thus arranged, the plurality of simultaneously-radiating emitting elements collectively provide an extended beam of diffuse radiation (42, Figs. 4 and 5) to more uniformly illuminate the region of space where objects are to be sensed ... The detecting elements are arranged, preferably in a linear array, in proximity with the emitting elements and with the sensitivity pattern of each element oriented in substantially the same direction to receive reflected radiation from the illuminated region of space ... [Defendant's Exhibit O, pages 9–10.]

In support of Jonsson's appeal, his attorneys argued that various of the prior art patents were distinguishable since they relied on sequential rather than simultaneous operation of light sources directed in substantially the same direction. (Defendant's Exhibit O, pages 17–32).

On February 11, 1982, Jonsson filed a continuation-in-part application (First CIP Application) of the Parent Application, copying Claims 1–18 of the Parent Application and adding Claims 19–24. On September 15, 1983, the Examiner required restriction between the claims drawn to "photocells and circuits" and Claims 16–18 and 24 drawn to "radiant energy control motor systems". (Defendant's Exhibit P). On August 21, 1984, Claims 16–18 and 24 of the First CIP Application were issue as the '251 Patent.

On August 20, 1982, Jonsson filed a second CIP Application, as well as a preliminary amendment, which ultimately matured into the '912 Patent. Jonsson amended Claim 16 to change the description of the radiation sources from "a plurality of elements" to "means". The description of the electrical signal generating component was changed from "simultaneously supplying electrical signals to all of said elements" to "means supplying an electrical signal to said emitting means". Finally, the description of the detection component was changed from "a plurality of radiation detecting elements ..." to "radiation de-

tecting means ..." While "simultaneously" was removed from the claim language, "diffuse radiation" remained. In support of the amendment, the attorneys for Jonsson stated that "... applicant realized that claim 16 could be given an interpretation that would be unduly narrow in view of the prior art." Jonsson did not point out why the claims would be unduly narrow. On December 24, 1985, the Second CIP Application (with seven new dependent claims and a terminal disclaimer) was allowed and issued as the '912 Patent.

*The Accused Device: Stanley's Sentrex and Sentrex 2*

The device accused of infringing the patents in suit is another automatic door opening system, Sentrex and Sentrex 2, both made by defendant Stanley, assignee of the Kornbrekke et al patents (Defendant's exhibits C–1, C–2, and D). Stanley's first version of the Sentrex sensor utilized two sensor units on each side of the door, one adjacent the hinge edge and a second adjacent the latch or swing edge. In most installations, the approach side sensors were utilized to determine when a person was approaching the door and to generate an approach signal to open the door. Each sensor unit contained seven infrared emitters and one infrared detector. (Appendix B).

In Sentrex 2 installations, only one infrared sensor unit is provided on each side of the door and it is located adjacent to the latch or swing edge. Each sensor unit has eight infrared emitters and one infrared detector. A microwave "approach" sensor unit is mounted above the door and is employed to sense the approach of a pedestrian and generate an "operate" signal for opening the door. The Sentrex 2 infrared sensor on the "approach" side of the door remains off until the door begins to open. Only the microwave sensor unit is employed for opening the door upon the approach of a pedestrian.

The parties do not dispute that in the Sentrex units, the infrared emitters of all of the sensor units are pulsed, *one at a time, in pulse bursts* in a predetermined sequence. An emitter is pulsed on one side of the door, and then an emitter is pulsed on the other side of the door, so that operation alternates between the two sides of the door. During the operation of each emitter, *only one detector* (i.e., the detector mounted in the same sensor unit as the active emitter) is active in detecting reflected radiation.

Each Sentrex emitter, according to the patent specifications, has a defined narrow angle (20 degree) beam of focused radiation. Stanley emphasizes that the beams do not overlap. Jonsson argues that the beams actually do overlap. There is no dispute, however, concerning the structure of the Sentrex units, or with the sequential nature of Sentrex's operation. In Sentrex and Sentrex 2, the emitters are disposed in different angular orientations in housings located at the edges of the door and only one emitter at a time is pulse to emit radiation. The range and distance covered by each emitter is regulated, and each emitter is energized at a different power level. Stanley asserts that by regulating the range of each emitter, the size and shape of the total detection zone of each sensor unit is more precisely regulated than is the case with the Jonsson Visionpulse unit. The detection zone changes as the door swings between its closed and open positions. In contrast, the Visionpulse unit produces diffuse illumination over a large zone. As the door opens, Visionpulse emitters are turned down to avoid receiving a reflected signal from the wall, and the Visionpulse sensor on the safety side of the door is turned off at about 45 degrees (Defendant's Exhibits F and G).

*The Summary Judgment Standard*

Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). As the Supreme Court has held:

> The inquiry performed is the threshold inquiry of determining where there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The Court is required to view the evidence in the light most favorable to the non-moving party, and to give that party the benefit of all reasonable inferences to be drawn from the underlying facts. *Hasan v. CleveTrust Realty Investors, Inc.,* 729 F.2d 372 (6th Cir.1984).

As noted above, both the Sixth Circuit and the Federal Circuit have indicated that summary judgment of non-infringement is appropriate where there are no genuine issues of material fact and when the Court, without the aid of expert opinion, can determine that the accused device does not infringe on the patents in suit. *Scharmer* and *Barmag Barmer, supra.* In *Townsend Engineering Company v. HiTec Co. Ltd.,* 829 F.2d 1086, 1089–90, 4 U.S.P.Q.2d 1136, 1138–39 (Fed.Cir.1987), the Federal Circuit reaffirmed the appropriateness of summary judgment in the appropriate case:

> Although infringement, either literal or under the doctrine of equivalents, is a question of fact, *see Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S 605, 609 [70 S.Ct. 854, 856, 94 L.Ed. 1097], 85 U.S.P.Q. 328, 331 (1950), " '[s]ummary judgment is as appropriate in a patent case as in any other' where no genuine issue of material fact is present and the movant is entitled to judgment as a matter of law." *Brenner v. United States,* 773 F.2d 306, 307, 227 USPQ 159, 160 (Fed.Cir.1985) (quoting *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.,* 731 F.2d 831, 835, 221 USPQ 561, 564 (Fed.Cir.1984). Thus, the granting of summary judgment will be upheld "where the claims do not 'read on' the accused structure" to establish literal infringement "and a prosecution history estoppel makes clear that no actual infringement under the doctrine of equivalents can be found." *Id.; Builders Concrete, Inc. v. Bremerton Concrete Prods. Co.,* 757 F.2d 255, 225 USPQ 240 (Fed.Cir.1985).

### Literal Infringement

■ Plaintiff bears the burden of proving infringement by a preponderance of the evidence. *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1361, 219 U.S.P.Q. 473, 480 (Fed.Cir.1983). Plaintiff may prove infringement in one of two ways: literal infringement or by the doctrine of equivalents. Every limitation present in a patented article must be embodied in an accused device before a finding of literal infringement can be made. *Builders Concrete,* 757 F.2d at 257, 225 U.S.P.Q. at 241.

■ Analysis of a patent infringement claim is a two-step process. First, the patent claims must be interpreted or construed to determine their scope. *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 866, 228 U.S.P.Q. 90, 92 (Fed.Cir.1985). Second, the Court must make a determination of whether the properly interpreted claims encompass the accused structure. *Mannesmann Demag Corp. v. Engineered Metal Products Co., Inc.,* 793 F.2d 1279, 1282, 230 U.S.P.Q. 45, 46 (Fed.Cir.1986). The determination of the scope of a claim is a matter of law. *Windsurfing International, Inc. v. AMF Corp.,* 782 F.2d 995, 1000, 228 U.S.P.Q. 562, 565 (Fed.Cir.1986).

■ A claim is construed in light of the patent specification, the prosecution history and the other claims in the patent. *Loctite Corp.,* 781 F.2d at 867, 228 U.S.P.Q. at 93 (Fed.Cir.1985). Words which were defined in the specification must be given the same meaning when used in a claim. *General Electric Co. v. United States,* 572 F.2d 745, 753, 215 Ct.Cl. 636, 649–50, 198 U.S.P.Q. 65, 71 (1978). Arguments and remarks made by plaintiff's counsel during prosecution of the patent application can also be used to determine the scope of the claims. *See Townsend Engineering Co.,* 829 F.2d at 1090, 4 U.S.P.Q.2d at 1139. Finally, the comments of the inventor himself are valuable in discerning the scope of patent claims. As a general rule, "words in a patent claim will be given their ordinary and accustomed meaning, *unless the inventor used them differently."* *Envirotech Corp. v. Al George, Inc.,* 730 F.2d 753, 759, 221 U.S.P.Q. 473, 477 (Fed.Cir.1984) (emphasis added).

■ Plaintiffs argue that underlying factual disputes exist which should preclude summary judgment. While plaintiffs correctly observe that "[i]f complex scientific principles are involved or expert testimony is needed to explain a disputed term ..." summary judgment would be inappropriate, *Howes v. Medical Components, Inc.*, 814 F.2d 638, 643, 2 U.S.P.Q.2d 1271, 1273 (Fed.Cir.1987), this is not such a case. Plaintiffs suggest that expert testimony must be presented before the Court can interpret the term "diffuse" and other terms in the patent claims. The Court is persuaded, however by Mr. Jonsson's deposition comments, by the prosecution history, and by the language of the claims and specifications, that extrinsic evidence is not a prerequisite to determination of the scope of plaintiffs' patent.

At his deposition taken on January 29, 1986 (Defendant's Exhibits U and V), Bert Jonsson, the inventor of the patents in suit, testified with respect to his invention and its departure from the prior art. He conceptualized his inventive concept in a sketch which appears as Exhibit 7 within Defendant's Exhibit V. Appearing on the sketch is Mr. Jonsson's statement that the extended emitter comprising a multiplicity of emitting devices produces diffuse light to bathe the object within the zone which it covers.

On pages 53–57 of Defendant's Exhibit U, Jonsson described his concept of using an extended series of emitters operated simultaneously to create diffuse light.

I would describe diffuse light as light rays propagating in different directions, yes.

. . . . .

—if you extend the area so as to—so the light is not emanating from one single point, then you will have light that is crossing and will, in a given point, you will have light in many different directions ... From many different sources or many different points. The source could be one extended source.

. . . . .

Q. If I have a single light source, that is not a source of diffused light?

A. No that is not. It might be diverging light but not diffuse.

At pages 70–72 of Exhibit U, Mr. Jonsson pointed out the necessity of a multiplicity of spaced detectors to receive the reflected light:

Q. Now, I note that in Defendant's Exhibit 20 there are a multiplicity of light sensing elements; is that correct?

A. Yes, that is right.

Q. Is the number or placement of these sensors significant?

A. Yes, it is ... Since we are using what I was referring to as diffused light, the light we have reflected back from the object will be spread over a large area, so to collect as much as possible of this light, we have to do either of two things: A, collect it with our lens system, which wouldn't be good in this case; or B, we have to extend the light-sensitive area so as to collect as much as possible of the light which has been reflected back.

. . . . .

A. The light is spread out over an area which is relatively large compared to the detector area. That is, that most of the light will be lost. It wouldn't affect the detector, but if we fill the space here with detectors, the illuminated space, so to speak, with the detectors, then all the lights reflected back will contribute to the photo-current.

Jonsson's definition is consistent with what was argued to the Patent Office as to "diffuse light" and the distinctions over the prior art.

Stanley's Sentrex units do not produce diffused light, which is the essense of Jonsson's invention. At any given time, a Sentrex unit is producing only one narrow beam of light. Also, each Sentrex unit contains only one detector to receive light. Use of only one detector and sequential light, as opposed to simultaneous, were the hallmarks of the prior art which Jonsson found unsatisfactory.

The language of the claims and specifications support the conclusion that Stanley does not infringe. The Stanley units do not

include "... first and second sensing apparatus each comprising means for emitting a diverging beam of *diffuse* radiation in response to *a* supplied electrical signal", or "... means supplying *an* electrical signal to said emitting means." Also, Stanley units do not have a "plurality of radiation detecting elements," as called for in the claims of the '251 patent *and* the specifications of the '912 patent.

While patent claims are the measure of a patent grant, *Coleco Industries, Inc. v. United States International Trade Commission, et al.,* 573 F.2d 1247, 1253, 65 CCPA 105, 111–12, 197 U.S.P.Q. 472, 476 (1978), another helpful factor in claim construction is the use of the patent specification.

> In serving its statutory purpose, the specification aids in ascertaining the scope and meaning of the language employed in the claims inasmuch as words must be used in the same way in both the claims and the specification. U.S. Pat. Off. Rule 75(d). The use of the specification as a concordance for the claims is accepted by almost every court, and is a basic concept of patent law.

*Autogiro Co. of America v. United States,* 384 F.2d 391, 397–98, 181 Ct.Cl. 55, 63, 155 U.S.P.Q. 697, 702–3 (1967). The specifications of both the '251 and '912 patents define the relevant terms with such clarity that the Court can interpret the claims without relying on expert testimony.

At Column 5 of both patents, Jonsson stated: "Each of the light emitting diodes 24 is arranged to radiate a diverging pattern of radiation which the inventor then described and illustrated with reference to Figure 1." At Column 6, Jonsson stated:

> Because the sensing apparatus illustrated in FIG. 1 uses a plurality of over-lapping diverging light beams, forming diffuse light, rather than focused beams of radiation, for both the radiation emitting devices and the radiation detecting devices, it is susceptible to receiving and responding to radiation reflected off objects only within a limited range where multiple emitters illuminate the object with diffuse light and multiple receivers

detect the reflected diffuse light. Therefore, the radiation detector is not likely to respond to an object at a relatively far distance, even if that object is highly reflective, since both the illumination of the object and the sensitivity of the detectors is greatly reduced with distance because of the diffuse nature of the illumination and detection as compared to focused beam illumination and detecting devices. [underlining indicates text added in response to rejection by the Patent Office Examiner.]

Also in Column 6, the specification makes clear that the sensor unit on the approach side of the door is utilized to generate the signal which operates the motor to open the door: "Opening of the door 30 by motor 33 is effected in response to the detection of an object by sensing apparatus 10, which is mounted on the side of the door illustrated in FIG. 2 facing in a second direction with respect to the door."

In sum, the claims and specification of the patents in suit indicate that plaintiffs' definition of "diffuse" illumination was the essence of the invention allegedly infringed.

This conclusion corresponds to arguments made during prosecution of the applications which matured into the patents in suit, i.e., the "file wrapper" or prosecution history (summarized above). As the Federal Circuit noted in *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.,* 849 F.2d 1430, 1437–38, 7 U.S.P.Q.2d 1129, 1135 (Fed.Cir.1988), the file wrapper can be used as an aid to interpretation:

> [A]rguments made during the prosecution history are relevant in determining the meaning of the terms at issue. Those arguments, and other aspects of the prosecution history, as well as the specification and other claims, must be examined to ascertain the true meaning of what the inventor intended to convey in the claims. *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 867, 228 USPQ 90, 93–94 (1985). Using the prosecution history in that manner is different from prosecution history estoppel, which is applied as a limitation upon the doctrine of

equivalents after the claims have been properly interpreted. *Id.*, 781 F.2d at 870, 228 USPQ at 96.

The prosecution history leads the Court to conclude that after the initial rejections by the Patent Office, plaintiffs amended their claims to define the illumination as "diffuse" and to emphasize the necessity for the simultaneous emission of diffuse light.

Jonsson contends that the "real meaning" of "diffuse" is limited to the dictionary definition submitted to the Examiner to support plaintiffs' argument that the addition of the term to the specification and claims was not new matter, i.e., light "moving in many directions". While it is certainly true that an inventor "is his own lexicographer," *NPD Research, Inc. v. The United States*, 15 Cl.Ct. 113, 8 U.S.P.Q.2d 1125, 1128 (1988), there is no genuine issue of fact if the prosecution history, the specification and the representations of the inventor make the meaning of the term abundantly clear. Moreover, the applicant can be his own lexicographer only if he is consistent. *ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1579–80, 6 U.S.P. Q.2d 1557, 1560 (Fed.Cir.1988).

*Claim Differentiation*

Plaintiffs argue that the doctrine of claim differentiation precludes acceptance of defendant's suggested definition of "diffuse light". Under this rule, "the presence of narrow claims ... is evidence that limitations are not to be written into the broader claims." *Bepex Corp. v. Black Clawson Co.*, 208 U.S.P.Q. 109, 122 (S.D.Ohio 1980), *citing Duplan Corp. v. Deering Milliken, Inc.*, 444 F.Supp. 648 at 710, 197 U.S.P.Q. 342 at 396 (D.S.C.1977). The doctrine "embodies the common sense notion that ordinarily language of one claim should not be so interpreted as to make another claim, such as a claim dependent on the first claim, identical in scope." 4 D. Chisum, Patents, Section 18.03[6] (1988).

Plaintiffs' claim differentiation argument is based on the language of the '912 patent. Claim 1 of the '912 patent recites "radiation detecting means" for receiving reflected light. Claim 9 specifically calls for a further limitation to the broad language of claim 1 by reciting "wherein said detection means ... comprise a plurality of detecting elements". Plaintiffs argue that "a limitation which appears only [in] another claim, in this case claim 9" cannot be read into claim 1. Plaintiffs also contend that the Court is precluded by the doctrine of claim differentiation from reading the requirement that "diffuse light" must originate "from a plurality of said emitters" into the '912 patent claims when the limitation does not appear in another claim and was replaced by "means for emitting a ... beam of diffuse radiation" in plaintiffs' '912 application.

■ The doctrine of claim differentiation is not an absolute, immutable rule: it is a guide to the construction of claims. *Autogiro Co. of America v. United States*, 384 F.2d 391, 404, 181 Ct.Cl. 55, 73, 155 U.S.P.Q. 697, ——, (1967). The revisions in plaintiffs' '912 patent do not alter the undisputed prosecution history. Plaintiffs argued their definition of "diffuse" light and carried that argument into Claim 16 (Claim 1 of the '912 patent). Moreover, *Builders Concrete, Inc. v. Bremerton Concrete Products Co.*, 757 F.2d 255, 259–60, 225 U.S.P.Q. 240, 243 (Fed.Cir.1985) indicates that arguments made as to terms in one claim apply to the same terms when used in other claims:

Although claim 10 is the only claim in suit, the prosecution history of all claims is not insulated from review in connection with determining the fair scope of claim 10. To hold otherwise would be to exalt form over substance and distort the logic of this jurisprudence, which serves as an effective and useful guide to the understanding of patent claims. The fact that the "passage" clause of patent claim 10 was not itself amended during prosecution does not mean that it can be extended by the doctrine of equivalents to cover the precise subject matter that was relinquished in order to obtain allowance of claim 1. It is clear from the prosecution history that the allowance of claim 1, the broadest claim with respect to the other elements of the float, de-

pended on the amendment narrowing its "passage" definition to that of claim 10.

The modification of Claims in the '912 patent did not change the meaning of "diffuse" light as previously argued to the Patent office. The Examiner, by allowing the use of "means" rather than "plurality of elements" did not indicate that he had accepted any change in what generated the "diffuse" light defined in the claims. Presumably, an elongated light source such as a two-foot fluorescent bulb extending across the width of a door could be substituted for the multiple spaced emitters illuminated simultaneously, but defendant's device cannot be seen as reasonably falling within the '912 claims. Claims phrased in terms of "means" such as those in the '912 patent are common, but could "always be subject to a challenge for specificity if not construed to be limited to the structure recited in the specifications," *Stewart–Warner Corp. v. City of Pontiac, Mich.*, 717 F.2d 269, 278, 219 U.S.P.Q. 1162, 1169 (6th Cir.1983), and to the arguments made to the Patent Office in differentiating the invention from the prior art. Moreover, a continuation application is considered part of the "same transaction" as the parent application, and plaintiffs could not use a continuation to recapture subject matter relinquished in the earlier proceedings before the Examiner. *Square Liner 360 Degrees, Inc. v. Chisum*, 691 F.2d 362, 371, 216 U.S.P.Q. 666, 672 (8th Cir.1982).

In conclusion, the Court finds there is no literal infringement of plaintiffs' patent. Sentrex and Sentrex 2 do not "read on" the claims of the patents in suit as interpreted.

*Infringement under the Doctrine of Equivalents; File Wrapper Estoppel*

In plaintiffs' response to defendant's motion, plaintiffs suggest that even if the Court finds no literal infringement, a jury should consider whether the doctrine of equivalents applies. The doctrine of equivalents states that a patent is infringed if the accused device performs substantially the same function in substantially the same way to obtain substantially the same result. *Graver Tank Co. v. Linde Air Products Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). The determination of whether the accused device is an equivalent of the patented invention is a question of fact. *Graver Tank Co.*, 339 U.S. at 609, 70 S.Ct. at 856. However, no genuine issue of fact is presented if it appears from the patent claims, specification, drawings, and file wrapper that extrinsic evidence in the form of testimony from those skilled in the pertinent art is not needed to explain terms of art, evaluate prior art, or resolve questions as to the application of descriptions to the accused devices. *United States v. Esnault–Pelterie*, 303 U.S. 26, 30–31, 58 S.Ct. 412, 414–15, 82 L.Ed. 625, 629 (1938), *Duplan Corporation v. Deering Milliken, Inc.*, 370 F.Supp. 769, 774, 180 U.S.P.Q. 373, 377 (D.S.C.1973), and cases cited therein.

Plaintiff contends that defendant's motion should be denied since the normal and grammatically correct reading of '251 patent claim 1 requires a construction directly at odds with that asserted by defendant. Claim 1 of the '251 patent requires that the door sensors each have "a plurality of elements, *each* for emitting a diverging beam of diffuse radiation." (Emphasis added). Plaintiffs contend that this supports their position that the claims cover a single point source emitter. The grammatical construction is at odds, however, with plaintiffs' definition of "diffuse" light as argued to the Patent Office to obtain allowance over the prior art. The Court does not have to determine why the Examiner allowed language that did not grammatically reflect plaintiffs' definition. The Court "need merely determine whether limitations were introduced into the patent application following rejections by the Examiner because the applicants, having limited their claims by amendment and accepted a patent bring themselves within the doctrine of file wrapper estoppel." *Duplan Corporation v. Deering Milliken, Inc.*, 370 F.Supp. 769, 785, 180 U.S.P.Q. 373, 385 *citing Smith v. Magic City Kennel Club, Inc.*, 282 U.S. 784, 789, 51 S.Ct. 291, 293, 75 L.Ed. 707, 712 (1931).

While it is true that "the claims measure the invention," *Kaiser Industries Corp. v.*

*McLouth Steel Corp.*, 400 F.2d 36, 158 U.S.P.Q. 565 (6th Cir.1968), the Court cannot rely too heavily or strictly on this oft-quoted rule. *Stewart Warner Corp. v. City of Pontiac, Mich.*, 717 F.2d 269, 277, 219 U.S.P.Q. 1162, 1168–69 (6th Cir.1983). The rule that patent claims are to be interpreted "in light of the specifications and both are to be read with a view to ascertaining the invention" is "equally important." *Id., citing Olympic Fastening Systems, Inc. v. Textron, Inc.*, 504 F.2d 609, 183 U.S.P.Q. 449 (6th Cir.1974). Overly technical interpretation of the claim language is disfavored. *Id.*

 Therefore, before reaching the issue of infringement under the doctrine of equivalents, the Court must first determine whether the patent owner is estopped from asserting the charge under the doctrine of file wrapper estoppel. File wrapper estoppel applies when a patent applicant makes broad claims in his initial applications to the Patent Office which he subsequently gives up in order to obtain the patent. *Exhibit Supply Co. v. Ace Patents Corp.*, 315 U.S. 126, 136–137, 62 S.Ct. 513, 518–19, 86 L.Ed. 736 (1942). File wrapper estoppel is a matter of law. *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d at 870–71, 228 U.S.P.Q. at 96. The file wrapper contains numerous elements which can properly be used to determine whether file wrapper estoppel properly lies:

> [t]he prosecution history (sometimes called "file wrapper and contents") of the patent consists of the entire record of proceedings in the Patent and Trademark Office. This includes all express representations made to convince the examiner that the claimed invention meets the statutory requirements of novelty, utility, and nonobviousness.

*Standard Oil Company v. American Cyanamid Company*, 774 F.2d 448, 452–53, 227 U.S.P.Q. 293, 296 (Fed.Cir.1985). *See also Townsend Engineering Company v. HiTec Co. Ltd.*, 829 F.2d 1086, 1090, 4 U.S.P.Q.2d 1136, 1139 (Fed.Cir.1987).

The Court's primary inquiry is whether "the patentee obtained his patent only by accepting the limitations imposed by the Examiner." *Calmar, Inc. v. Cook Chemical Co.*, 383 U.S. 1, 14, 86 S.Ct. 684, 692, 15 L.Ed.2d 545, 148 U.S.P.Q. 459, 473 (1966). Upon consideration of the entire record, the Court agrees with defendant that the term "diffuse" in Claim 1 of both patents in suit was introduced to distinguish Jonsson's invention from the prior art. As defined by the Jonsson, "diffuse" light required simultaneously provided electrical signals and a plurality of light sensing elements. Prosecution history estoppel precludes an effort by plaintiffs to claim as equivalents that which they specifically distinguished in their efforts to obtain allowance of their patents.

*Demonstration of the Commercial Embodiment of the Plaintiff's Patent, the Defendant's "Engineering Drawings", and Plaintiffs' Reliance of Sensors being Door–Mounted*

 At a hearing on defendant's motion, the Court viewed a demonstration of both Visionpulse and Sentrex units as well as the defendant's engineering drawings. The Court is mindful that the patent claims, specification and prosecution history are controlling as to the meaning and scope of the patent claims, and that infringement is determined by comparing the accused product with the properly construed claims in suit rather than a with a "preferred embodiment described in the specification or with a commercialized embodiment of the patentee", *SRI International v. Matsushita Electric Corporation of America*, 775 F.2d 1107, 1121, 227 U.S.P.Q. 577, 586 (Fed.Cir.1985). The benefit of the demonstration was that it familiarized the Court with the subject matter of this suit.

The patents, their prosecution history, and the briefs submitted to the Court, provide an adequate basis for decision of defendant's motion. Plaintiffs argue, however, that summary judgment would not be proper since they disagree with defendants over whether defendant's "engineering drawings" (Defendant's Exhibit F) accurately portray the operation of the Sentrex units. The dispute over the drawings (which are not part of defendant's patents)

does not create a genuine issue of material fact. Neither defendant's drawings nor plaintiffs' responding drawings are contained in the parties respective patents. Also, the drawings are not contained in affidavits. In any case, the operation of both plaintiffs' and defendant's devices can be understood without recourse to extrinsic evidence.

Plaintiffs' contend that claims 16–19 of the Parent Application were allowed because they define a sensor which is door mounted. The prosecution history reveals otherwise. Plaintiffs argued the significance of "diffuse" light and the arrangement of their sensors and emitters in order to obtain allowance.

*Conclusion*

Defendant's motion for partial summary judgment as to infringement is granted. All remaining issues will come on for trial on June 1, 1989. The parties shall submit statements of remaining issues for trial by May 15, 1989.

IT IS SO ORDERED.

1410

APPENDIX A: JONSSON'S PATENT

FIG. I

FIG. 2

FIG.3

FIG. 4

FIG. 5

FIG. 6

FIG.7

FIG. 8

FIG. 9

1414

FIG. 10 FIG. II

FIG. 12

FIG. 13

FIG. 14

FIG. 15A

FIG. 15B

FIG. 16

FIG. 1

FIG. 2

FIG. 3

FIG. 4

FIG. 5

FIG. 6

FIG. 7

FIG. 8

FIG. 9

FIG. 10a

FIG. 10b

FIG. 11